# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| STEVE SANTHUFF | CIVIL ACTION NO. 17-cv-1404-JWD-EWD |
| VERSUS | JUDGE JOHN W. deGRAVELLES |
| UNITED PARCEL SERVICE, INC., AND PAUL WITT | MAGISTRATE JUDGE ERIN WILDER-DOOMES |

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants, United Parcel Service, Inc. ("UPS") and Paul Witt (collectively "Defendants"), submit this memorandum in support of their Motion for Summary Judgment. The undisputed evidence shows Plaintiff's claims fail as a matter of law.[1]

## I. FACTS[2]

Steve Santhuff ("Plaintiff") is a current UPS employee, working as an On Road Supervisor in UPS's Port Allen facility. (Pl. 31)  Plaintiff began his UPS employment in Georgia in 1998. (Pl. 38)  He moved to Louisiana in 2014, where he began as an On Road Supervisor in UPS's Gonzales facility. (Pl. 53, 59)  In the fall of 2015, Plaintiff asked to transfer from Gonzales to Baker due to problems he experienced with a number of the Gonzales employees. (Pl. 59, 61, 66, 159–162)  Specifically, Plaintiff claims he was the only supervisor issuing discipline, which caused the Gonzales employees to resent him. (Pl. 66, 162)

Plaintiff said his first year in Baker was smooth, but then his boss, Jeff Hill, asked Plaintiff and other supervisors to improve the drivers' performance. (Pl. 154)  In response, Plaintiff

---

[1] Relevant portions of Plaintiff's deposition transcript and exhibits are attached to Defendants' motion as Exhibit A, and citations will be designated as "Pl. __" and "Pl. Exh. __," respectively.  Declarations of Jeffrey Hill, Wilfred Edwards, and Paul Witt are attached hereto as Exhibits B–D, respectively.  Relevant excerpts of the Freedom of Information Act file for Santhuff's Charge No. 461-2017-01596 (received from the EEOC and produced to Plaintiff in discovery as DEF 1098–1143), is attached hereto as Exhibit E.  All references to Plaintiff's Complaint refer to his Amended Complaint (R. Doc. 10).

[2] For *purposes of this motion only*, Defendants accept Plaintiff's version of the facts, where a dispute exists.

increased his disciplinary efforts, causing the Baker employees to resent Plaintiff. (Pl. 154)
Plaintiff said the Baker employees filed grievances against him because they, like the Gonzales
employees, did not want to be supervised as closely as Plaintiff supervised them. (Pl. 154)  In
January 2017, Plaintiff learned of approximately eight complaints about Plaintiff's supervision
made to the UPS 800 line. (Pl. 240, 242)  In May of 2017, employees submitted more 800 line
complaints and also submitted a memorandum, complaining, among other things, of
unprofessional discipline and that Plaintiff pressured drivers by "soliciting deals and handouts."
(Pl. 201–202, 248; Pl. Exh. 48)  The employees asked UPS to investigate Plaintiff. (Pl. Exh. 48)
UPS interviewed Plaintiff and some of the employees involved. (Pl. 245, 264)[3]

In the investigation, Plaintiff acknowledged that employees had complaints about him and
even said one employee called him the "Discipline Monster." (Pl. 248–249; Pl. Exh. 48)  He said
some employees viewed Plaintiff as "sarcastic" and "arrogant." (Pl. 267; Pl. Exh. 50)  Plaintiff
said he had seen these complaints coming since January 2017. (Pl. Exh. 50)  With respect to the
allegations that Plaintiff solicited handouts, Plaintiff admitted to asking one employee, Kevin
Shows, to deliver a key to someone along Shows' route.  Specifically, he told Shows to log out of
the time system, perform this personal errand for Plaintiff, and then log back in to resume being
paid. (Pl. 259–261; Pl. Exh. 50)  Similarly, Plaintiff asked another driver, Wayne Mitchell, to
deliver a personal check for Plaintiff along Mitchell's delivery route and to log out and take
personal time to perform Plaintiff's errand. (Pl. 257–268; Pl. Exh. 50)  Plaintiff also admitted he
distributed flyers to his employees before a meeting, asking them to perform free manual labor on
his personal property. (Pl. 252–255)  Based on UPS's findings regarding these and other listed

---

[3] While Plaintiff alleged in his Complaint that UPS failed to investigate the unfounded complaints against him, he
testified he does not know who Wilfred Edwards in Human Resources ("HR") spoke to as part of Edwards'
investigation. (Pl. 265–266; Compl. ¶ 23)

issues, UPS issued Plaintiff a Disciplinary Acknowledgment, dated June 26, 2017. (Pl. 275–277; Pl. Exh. 53)  In the acknowledgment, UPS advised Plaintiff that his actions were contrary to UPS principles and that he would not be recommended for a Management Incentive Program (MIP) bonus. (Pl. Exh. 53)

Plaintiff's Division Manager, Paul Witt, and Wilfred Edwards, in HR, met with Plaintiff to administer the Disciplinary Acknowledgment. (Pl. 276–277)  During the meeting, Witt realized the acknowledgment contained a typo in the spelling of Kevin Shows' name. (Pl. 277; Witt Decl. ¶ 6)  Witt asked Plaintiff to hand the document to Witt, but Plaintiff refused to do so unless Witt agreed to give Plaintiff a copy right then. (Pl. 277)  Rather than simply following instructions and letting his manager correct the document, Plaintiff refused to return the document, insisting he would not pass it back until he photographed the document containing the typo. (Pl. 279–282) Witt instructed Plaintiff not to photograph it and again told Plaintiff to return the document. (Pl. 279–280)  Again ignoring Witt's instructions,  Plaintiff photographed the document and still did not hand it to Witt. (Pl. 279–280)  After refusing several direct instructions, Witt told Plaintiff to leave the property. (Pl. 279–280)  Plaintiff did so, but he took the document with him. (Pl. 279–280)  Plaintiff admitted his conduct made Witt "angry" and "upset." (Pl. 279–280)  A week or so later, UPS gave Plaintiff a corrected version of the document (with Shows' name spelled correctly), but it also referenced Plaintiff's insubordination in refusing to return the document, and it increased Plaintiff's discipline to include removal of a salary increase. (Pl. Exh. 54)

Shortly thereafter, UPS decided to transfer Plaintiff, this time to its Port Allen facility, where Plaintiff remains employed today, performing the same job duties he performed in Baker. (Pl. 60)  Plaintiff said he was initially uncomfortable with the transfer to Port Allen, but he soon

became "comfortable" in Port Allen. (Pl. 61–63, 68)  Per Plaintiff, his move to Port Allen was again the result of employee complaints about him. (Pl. 186–189, 293)

According to Plaintiff, he suffers from Pigmentary Glaucoma. (Compl. ¶ 11)[4]  In March 2016, Plaintiff said his Pigmentary Glaucoma worsened, which he said caused him to take a medical leave from March to July of 2016. (Pl. 171 Pl. Exh. 29, pp. 10–11)  Plaintiff worked for Jeff Hill, Business Manager, at the time. (Hill Decl. ¶ 3)  Paul Witt supervised Hill. (Witt Decl. ¶ 2)  When Plaintiff was ready to return from his medical leave, he called UPS's 800 line to request an accommodation, and he completed an Accommodation Checklist on June 1, 2016. (Pl. 123, 167, 171; Pl. Exh. 28)  Plaintiff stated in his accommodation paperwork, "If I can conduct the job of an on road supervisor without a requirement to physically deliver routes myself or take over routes then I should not have an excessive physical activity or excessive pigment release/blockage." (Pl. Exh. 29, p. 11)  Plaintiff also submitted his doctor's statement saying Plaintiff "should be restricted from exertional physical activity such as heavy lifting." (Pl. Exh. 29, p. 18)

Following Plaintiff's submission of this accommodation paperwork, Wilfred Edwards in HR met with Plaintiff to discuss possible accommodations. (Pl. 123, 168, Edwards Decl. ¶ 8)  Edwards "was polite, professional, and . . . made [Plaintiff] feel comfortable." (Pl. 180)  In the meeting, UPS and Plaintiff agreed to the following accommodation:  "No delivering packages more than 3 consecutive hours in any given day." (Pl. 174–175, 179–180; Pl. Exh. 30)[5]  Plaintiff found the meeting cordial, and he was pleased with the accommodation process. (Pl. 170, 178)

---

[4] UPS does not concede this condition constitutes a disability, but it is not moving for summary judgment on this issue.

[5] In his Complaint, Plaintiff misstates the agreed-upon accommodation, saying "it was agreed he would work no more than three hours per day of physical labor." (Compl. ¶ 12)  In his deposition, Plaintiff said he believed the accommodation was no delivering packages for a total of three hours per day, consecutive or not. (Pl. 175–180)  Plaintiff said no one at UPS disagreed with his interpretation of three non-consecutive hours. (Pl. 178)

According to Plaintiff, upon his return from months of leave, he was assigned to perform supervisory rides with drivers five days. (Pl. 192)  Before his leave, Plaintiff said he rode with his drivers two to three days per week. (Pl. 223)  Plaintiff complained to Hill and Edwards that he should not have to ride five days per week, but Edwards advised Plaintiff that riding five days per week was within the regular duties of his position. (Pl. 125, 192)  Plaintiff acknowledged his duties included these rides and that his job did not prescribe a maximum number of days an On Road Supervisor must perform these rides. (Pl. 202–204, 223)  Notably, Plaintiff alleges this period of riding five days/week only lasted for a brief period from July 11, 2016 to August or September 2016. (Pl. 230)[6]  Thereafter, Plaintiff returned to riding fewer days. (Pl. 211)

While Plaintiff complained that riding two "extra" days per week hurt his back and legs, he admitted he had no disability related to his back or legs. (Pl. 305–306)  Plaintiff also speculated that riding five days per week harmed his eyes, but he admitted he had no medical evidence that riding or jarring while riding in the jump seat hurt his eyes, nor is he asserting such an allegation. (Pl. 176, 184, 211–212, 222–223)  Plaintiff conceded he submitted no medical information beyond his mere restriction of delivering packages for more than three hours per day. (Pl. 223)  Although Plaintiff underwent a subsequent surgery in 2017, he said he never needed a change in his work restrictions, which are still being accommodated today. (Pl. 227)

Plaintiff filed a Charge of Discrimination with the EEOC on July 25, 2017, alleging ADA discrimination and retaliation. (Pl. Exh. 74)  The EEOC mailed a Notice of Right to Sue (requested by Plaintiff) on August 1, 2017. (Pl. Exh. 74)

---

[6] He said he rode 5 days/week for 2.5-3 months, but his testimony about dates shows only .5-1.5 months. (Pl. 230)

PD.24671298.1

## LAW AND ARGUMENT

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The Supreme Court has interpreted this rule to mandate the entry of summary judgment against a party who is unable, after an adequate time for discovery, to establish the existence of any one element essential to his claim and on which the party would bear the burden of proof at trial. *Celeotex Corp. v. Catrett*, 477 U.S. 317, 321–322 (1986).

The Supreme Court has addressed at length the evidence a plaintiff must produce to avoid summary judgment. The "mere existence of a scintilla of evidence" is insufficient. Likewise, the mere existence of some factual dispute between the parties is insufficient. Rather, the issue of fact is "genuine" only if the evidence is sufficient to support a reasonable jury verdict for the plaintiff. *See Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263–1264 (5th Cir. 1991), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 246–252 (1986).

## II.    PLAINTIFF'S DISABILITY CLAIMS FAIL.

Plaintiff's ADA and La. R.S. § 23:323[7] claims consist of two allegations: (1) UPS failed to grant a reasonable accommodation (Compl. ¶ 32), and (2) UPS required Plaintiff to "work more difficult jobs" upon his return from leave. (Compl. ¶ 33) Both allegations are unsupported.

### a.  Plaintiff Cannot Show that UPS Failed to Accommodate Him.

Plaintiff cannot show UPS failed to reasonably accommodate his limitations. *See Feist v. La. Dept. of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013) (listing statutory elements required for failure-to-accommodate claim). When Plaintiff called the UPS Compliance line prior to returning to work, UPS HR met with Plaintiff to discuss possible accommodations of

---

[7] Federal and state courts use ADA and Title VII standards to analyze LEDL claims. *Thibodeaux v. Dow Chem. Co.*, No. 16-00567-BAJ-RLB, 2018 WL 2269906 (M.D. La. May 17, 2018).

his work restrictions, and Plaintiff and UPS agreed upon the following accommodation:  no delivering packages more than three consecutive hours in any given day. (Pl. 179–180; Pl. Exh. 30)  Plaintiff said he was pleased when he left the accommodation meeting. (Pl. 304–305)

Plaintiff never attempted to re-initiate the interactive process to change the accommodation thereafter. (Pl. 180–181)    While Plaintiff subsequently complained of having to perform supervisory rides five days per week following his return to work, his complaints were that riding in the car made his legs and back sore:  "My back was hurting.  I didn't have a specific injury that I needed to report, but  my legs – the circulation in my legs were cut off.  My back was hurting." (Pl. 209)  In other words, while Plaintiff did not like performing these necessary rides five days per week, he did not need to revise his prior restrictions and accommodation because his legs and back were sore, which was unrelated to his eyes.  Plaintiff testified that he has no medical evidence that the jarring he allegedly experienced during these supervisory rides had any effect on his eye condition whatsoever.  (Pl. 176, 184, 211–212, 222–223)  Plaintiff never asked his doctor to revise his work restrictions, nor did he submit any additional medical information. (Pl. 180–181)  Rather, Plaintiff conceded he did not possess or submit any medical support for an accommodation that UPS failed to provide. (Pl. 173–174)   "[P]laintiff bears the burden of suggesting a reasonable accommodation to [his] employer."  *Harville v. Tex. A&M Univ.*, 833 F.Supp. 2d 645, 661 (S.D. Tex. 2011) (*citing Taylor v. Principal Financial Grp.*, 93. F.3d 155, 165–166 (5th Cir. 1996)). An employer is not liable for failing to provide accommodations when the employee fails to request an accommodation.  *Taylor*, 93 F.3d. at 165.  Rather, Plaintiff testified there was no "reason to resubmit" revised paperwork because he "lik[ed] the job" and "want[ed] to work the job," and he was worried that any additional accommodations may no longer allow him to perform the job. (Pl. 181)  Thus, UPS accommodated Plaintiff's only restrictions.

- 7 -

b. **Plaintiff has no Other Evidence of Disability Discrimination/Retaliation**.

Plaintiff claims his instruction to perform supervisory rides for five days a week was retaliatory for Plaintiff having taken a leave.[8] (Compl. ¶ 33) This claim also fails.

### 1. Plaintiff Failed to Exhaust Administrative Remedies, and the Claim is Untimely.

Plaintiff failed to exhaust his administrative remedies because he never filed a **timely** EEOC charge. Plaintiff returned to work on July 11, 2016, and he testified that he rode in the jump seat until August or September, 2016, but he is not sure of the date. (Pl. 230) Plaintiff first contacted the EEOC on July 6, 2017. (Exh. E) Therefore, his charge only covered conduct occurring 300 days before July 6, 2017, *i.e.*, conduct on or after September 9, 2016. *See Kirkland v. Big Lots Store, Inc.*, 547 F. App'x 570 (5th Cir. 2013); *Pike v. Alcohol and Tobacco Control of the La. Dept. of Rev.*, 157 F.Supp. 3d 523, 544 (M.D. La. 2015). However, the Baton Rouge flood on August 12-13, 2016 interrupted Baker center operations such that Plaintiff would have ceased riding five days/week as of that time, at the latest. (Hill Decl. ¶ 6) Since Plaintiff admitted he lacks specific dates of when he stopped riding five days per week, he cannot establish his claim was timely. *See generally*, *Boe v. Heart Clinic of Hammond, LLC*, No. 17-00217-BAJ-RLB (M.D. La. Dec. 1, 2017) (dismissing Plaintiff's claims as untimely).

### 2. Plaintiff Lacks Evidence That Riding was Retaliatory or Discriminatory.

Plaintiff lacks evidence that his temporary instruction to ride five days was discriminatory or retaliatory based on his health condition or need for leave. First, Plaintiff was assigned to ride five days following his return from leave because of business needs in Baker. (Hill Decl. ¶¶ 5, 7; Witt Decl. ¶ 5) Plaintiff had been absent for months, and the center fell behind on the drivers'

---

[8] Plaintiff's Complaint alleges Jeff Hill removed some of Plaintiff's prior authority, but Plaintiff negated this allegation when he testified he rode five days a week **and** performed his regular job duties. (Compl. ¶ 20; Pl. 203) In his deposition, Plaintiff also complained he missed Center Planning Meetings while riding five days/week, but Plaintiff admitted he suffered no discipline attributable to information missed in those meetings. (Pl. 196–199)

required Space & Visibility ("S&V") certifications, which certifications are accomplished by an On Road Supervisor riding with the drivers ("S&V rides"). (Pl. 75–76)  During Plaintiff's leave, the facility was short-handed and could not keep up with the S&V certifications. (Hill Decl. ¶¶ 5, 7)  Plaintiff concedes that conducting S&V rides and performance rides were part of his regular duties and that he rode with drivers two to three days per week for this purpose before his leave. (Pl. 223, 215)  After his leave, Plaintiff submitted no paperwork to suggest he was unable to continue supervisory rides with the drivers. (Pl. 180–182)  While Plaintiff believed he could still perform these rides two to three days/week, in his own mind he felt he should not have to conduct the rides five days/week. (Pl. 192)  In other words, Plaintiff's complaint was not that UPS assigned him new duties but rather that the frequency of his supervisory rides increased for a short time. Notably, consistent with his restrictions, Plaintiff acknowledged he was relieved from having to load or shuttle packages while performing these supervisory rides. (Pl. 203)

The legitimate, non-discriminatory and non-retaliatory reasons for these rides was to complete expiring S&V rides that Plaintiff had not been able to conduct during his lengthy leave and to perform other OJS rides.[9] (Witt Decl. ¶ 5; Hill Decl. ¶¶ 5, 7)  Plaintiff does not dispute that drivers needed to catch up on outstanding S&V certifications following his absence. (Pl. 205) Indeed, Plaintiff said he was able to catch up these near-expiring S&V certifications by riding five

---

[9] In cases alleging discrimination under the ADA, the plaintiff bears the burden of proving the defendant's actions were motivated by intentional discrimination. *St. Mary's Honor Ctr. v. Hicks*, 113 S. Ct. 2742, 2753–2756 (1993); *Rodriguez v. Eli Lilly & Co.*, 820 F.3d 759, 764 (5th Cir. 2016) (applying *McDonnell Douglas* to ADA claim) (*citing EEOC v. LHC Grp. Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)).  According to the three-tiered model of proof originally established in *McDonnell Douglas Corp. v. Green*, 93 S. Ct. 1817 (1973), a plaintiff must initially establish a prima facie case by proving facts sufficient to raise an inference of discrimination.  Then, if the employer articulates a non-discriminatory or retaliatory reason for its conduct, the plaintiff "bears the ultimate burden of proving that the employer's proffered reason is not true but instead is a pretext for the real discriminatory purpose." *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007).  Plaintiff must rebut each nondiscriminatory or nonretaliatory reason articulated by the employer. *Id.*  The only burden that shifts to the defendant after a prima facie case is made is one of producing evidence that an adverse employment action was taken for a legitimate nondiscriminatory reason. *Hicks*, 113 S. Ct. at 2753–2756.

PD.24671298.1

days per week. (Pl. 205, 208)  Plaintiff's testimony is contradictory about whether he stopped riding when he completed the S&V rides, or whether he continued performing observation rides thereafter, but either way, Witt generally intended Plaintiff to ride every day for only ten (10) days, in order to complete the S&V rides, and Plaintiff's continued riding, if at all, accomplished legitimate driver training purposes. (Pl. 208, 230; Witt Decl. ¶ 5; *See also* Hill Decl. ¶ 7)  Witt's testimony of his intent is undisputed and is supported by Plaintiff's own testimony that when Plaintiff unilaterally chose to discontinue riding five days a week, no one criticized him. (Pl. 210, 211)  Moreover, if Plaintiff continued to ride with drivers beyond the period needed to complete S&V rides, Plaintiff acknowledged his performance rides significantly improved the drivers' performance, thereby demonstrating the legitimate business reason for Plaintiff's rides. (Pl. 75, 203–205; Witt Decl ¶ 5; Hill Decl. ¶¶ 5, 7)  Thus, UPS had a legitimate, non-discriminatory and non-retaliatory reason for Plaintiff riding five days/week.

Moreover, Plaintiff lacks any evidence of pretext, including no evidence of discriminatory or retaliatory motive based on Plaintiff's health condition.  With respect to Hill, Plaintiff testified his relationship with Hill is "fine." (Pl. 96–97)  Plaintiff said he thinks Hill is "genuinely comfortable working with me and talking with me. . . ., " which belies any suggestion that Hill harbors discriminatory or retaliatory motives against Plaintiff based on any "disability." (Pl. 96–97)  Hill did not view driving five days a week as unfair, particularly since Hill and others have done the same. (Hill Decl. ¶¶ 5, 9)  Even so, when Plaintiff complained to Hill about riding five days/week, Hill contacted HR to ask whether the instruction to ride five days to complete S&V rides was appropriate, and he was assured that Plaintiff was not restricted from supervisory rides. (Hill Decl. ¶ 8; Edwards Decl. ¶ 11)

- 10 -

Turning to Witt, Plaintiff said his only basis for believing Witt gave the instruction discriminatorily is that Plaintiff heard second-hand that Witt told another supervisor, Everett Ozenne, to ride five days per week after returning from a leave. (Pl. 101–102; 302–303)  However, Plaintiff called Ozenne, who said Witt did **not** assign him to ride five days per week. *Id.*

Moreover, Plaintiff testified that no one in management, including Witt and Hill, made negative comments whatsoever about his health, his eyes, or anything health-related. (Pl. 122, 129, 303–304)[10]  Likewise, Plaintiff said he received all approved leaves of absence that he sought, and no one commented negatively about Plaintiff taking those leaves. (Pl. 121–122)  Notably, Plaintiff said he believes most supervisors, not just Plaintiff, had problems with Witt, which further refutes Plaintiff's claim that Witt harbored discriminatory or retaliatory motives toward Plaintiff. (Pl. 309)  Lastly, Plaintiff offered other explanations for why Witt might have issues with Plaintiff, including that Witt was friends with Blane Daze (with whom Plaintiff had disagreements) and that Plaintiff supported Darin Williams (discussed below), which explanations further negate Plaintiff's claim of disability discrimination or retaliation. (Pl. 159–162, 316–317)[11]

### III.    PLAINTIFF'S TITLE VII RETALIATION CLAIM FAILS.[12]

---

[10] Plaintiff testified that a co-worker, Frank Browder, said something after Plaintiff filed the lawsuit about Plaintiff not needing an accommodation, but Plaintiff "hasn't made that as part of a claim." (Pl. 127)

[11] In his deposition, Plaintiff suggested two other actions were possibly related to his ADA request, (1) his "pay loss" in 2017, and (2) the complaint letter UPS received from his subordinates in May 2017 (referred to by Plaintiff as the "Beuche Letter"). (Pl. 190)  Not only does Plaintiff admit no one made negative comments connecting these events to his ADA request, Plaintiff also admits the alleged events directly followed complaints by employees to management (usually because of discipline Plaintiff issued) and had nothing to do with his health condition. (Pl. 159, 249, 251) While Plaintiff believes Mike Beuche, a driver, wrote the letter at management's request, Plaintiff has no evidence that the letter was anything more than Beuche memorializing his verbal complaints in writing. (Compl. ¶ 21; Pl. 271)

[12] Plaintiff's Complaint includes references to La. R.S. § 23:967. (Compl. ¶¶ 33, 35)  However, other than conclusory references to the statute, Plaintiff's Complaint does not include sufficient factual allegations to establish such a claim. Plaintiff has not claimed that he complained of a violation of any state law, nor does he claim that any action was taken against him because of a report of a violation of law.  Instead, Plaintiff testified that the reason he believes he received discipline was because he took a disability leave and because he participated in an investigation.  Neither constitute reports of illegal activity, so they are not protected by La. R.S. § 23:967.  Additionally, the statute requires Plaintiff to **first** advise the employer of the violation of law. *Id.*  Plaintiff did not allege this element in his Complaint, nor did he testify to making such a report.

PD.24671298.1

Plaintiff claims UPS disciplined him (limited his pay increases and denied his MIP bonus) in retaliation for Plaintiff providing statements relating to an investigation of Plaintiff's former supervisor, Darin Williams. (Compl. ¶¶ 27, 35)

### a. Plaintiff Failed to Exhaust Administrative Remedies, and his Title VII Claim is Untimely.

Plaintiff's sole EEOC charge asserted a violation of the ADA, not Title VII. (Pl. 351; Pl. Exh. 74)  His EEOC charge also makes no mention of Plaintiff's statements relating to Darin Williams. (Pl. Exh. 74)  Accordingly, Plaintiff failed to exhaust his administrative remedies for a Title VII claim, and his time for doing so has expired. (Pl. Exhs. 55, 56)  *See* 42 U.S.C. § 2000e-5(e)1); *Conner v. La. Dept. of Health and Hospitals*,  247 F. App'x 480, 481 (5th Cir. 2007) (noting that employee has 300 days to file charge because Louisiana is a deferral state); *see also Stone v. La. Dept. of Rev.*, 590 F. App'x 332, 337–338 (5th Cir. 2014) (holding that plaintiff failed to exhaust administrative remedies as to constructive discharge claim where she alleged no facts in her charge that could reasonably encompass constructive discharge and therefore it fell outside "the scope of the EEOC investigation").  Therefore, Plaintiff's Title VII claim is barred.

### b. Plaintiff Cannot Establish the Essential Elements of his Title VII Claim.

Out of an abundance of caution, Plaintiff also could not establish his retaliation claim even if he had filed a timely charge.  To succeed, Plaintiff must establish: (1) he engaged in activity protected by the discrimination statutes; (2) he suffered an adverse employment action; and (3) a causal connection exists between his protected activity and the adverse employment action. *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007).

First, Plaintiff did not allege protected activity because he did not give statements in connection with a Title VII investigation of discrimination. (Pl. 320; Pl. Exhs. 55–56; Compl. ¶ 27)  Rather, his statements related to an investigation of a policy violation by his supervisor. (Witt

Decl. ¶¶ 8–9)  Second, although Plaintiff alleges he suffered a pay loss, his own testimony demonstrates he cannot establish what adverse employment action he suffered.[13]  Third, even if Plaintiff's pay was impacted in 2017, he could not demonstrate the requisite causal connection between his pay and protected activity.  As the Fifth Circuit explained, "[i]n retaliation claims, the plaintiff must ultimately show that the protected activity is the 'but for' cause of the adverse employment action." *Claiborne v. Recovery Sch. District*, 690 F. App'x 249 (5th Cir. 2017)

Plaintiff cannot link his statements in support of Darin Williams to his 2017 job actions. The gap between his 2015 statements and his 2017 discipline (that allegedly affected his pay) was approximately two years. (Witt Decl. ¶¶ 8–9; Edwards Decl. ¶ 14; Pl. Exhs. 53–54, 55–56)[14] *Hypolite v. City of Houston, Tex.*, 493 F. App'x 597, 607 (5th Cir. 2012) (holding nine-month period is too long to support causal link); *Cox v. DeSoto County, Miss.*, 407 F. App'x 848, 851 (5th Cir. 2011) (noting thirteen-month period is insufficient to support an inference of causation). Further, Plaintiff's claim that his statements regarding Darin Williams did not implicate Williams to the extent UPS sought is unsupported. (Compl. ¶ 27; Pl. 311–313)  The only information Plaintiff said UPS tried to elicit from Plaintiff was "the exact dates, times, and length of times," and Plaintiff's statements about Williams' conduct **were** part of the basis for discipline against Williams. (Pl. 320, 327; Witt Decl. ¶ 8)  Moreover, Plaintiff testified to the legitimate, non-retaliatory reasons for his 2017 discipline, *i.e.*, numerous employees complained about Plaintiff's supervision, Plaintiff admitted he sought unpaid, personal favors from subordinate employees, and

---

[13] In September of 2016, Plaintiff received one Disciplinary Acknowledgment for allowing driver DOT violations, but Plaintiff does not know whether his pay was impacted, and he said he received no negative job action. (Pl. 235–237) Plaintiff's payroll records show that in 2016, he received a MIP bonus of $7,356.75 and a salary increase. (Edwards Decl. ¶ 7) Although Plaintiff believes his bonus and salary were impacted for 2017, his payroll records show that for 2017, he received a pay increase and a MIP bonus of $5,315.77. (Edwards Decl. ¶ 7)  While Plaintiff argues his increase was smaller than he believes it should have been, he has no evidence of what pay increase was customary in 2017. (Pl. 287–288)

[14] Plaintiff testified that as of July 28, 2016, he had experienced no discipline by Jeff Hill or Paul Witt, and 2017 was the first time his pay may have been affected for disciplinary reasons. (Pl. 231)

Plaintiff refused direct instructions from Witt. (Pl. 146, 154, 187, 254, 262, 277; Pl. Exh. 14)

Lastly, no one said anything negative to Plaintiff about his statements in the Darin Williams matter.

(Pl. 325, 327)  For all of these reasons, Plaintiff's Title VII retaliation claim fails.

## IV.  PLAINTIFF IS NOT SUBJECT TO THE OVERTIME PROVISIONS OF THE FAIR LABOR STANDARDS ACT.

Section 7(a)(1) of the FLSA sets forth the general entitlement to overtime pay, but it is

subject to certain exemptions. 29 U.S.C. § 207(a)(1).  Three exemptions apply to Plaintiff:  the

Motor Carrier exemption, the executive exemption, and the administrative exemption.  Therefore,

Plaintiff is not entitled to overtime pay.

### a.  Plaintiff's Position is Subject to the Motor Carrier Exemption.

According to the Motor Carrier exemption, the FLSA's overtime provisions do not apply

to "any employee with respect to whom the Secretary of Transportation has power to establish

qualifications and maximum hours of service . . . ."  Section 213(b)(1).  The DOT's power to

establish requirements extends to employees who:

> (1) Are employed by carriers whose transportation of passengers . . . by motor vehicle is subject to his jurisdiction under Section 204 of the [MCA] . . . and (2) engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the MCA.

*Allen v. Coil Tubing Servs., L.L.C.*, 755 F.3d 279, 283 (5th Cir. 2014); *See also Amaya v. NOYPI*

*Movers, L.L.C.*, No. 17-20635, 2018 WL 3409150, at *2, n.2 (5th Cir. July 11, 2018).  UPS satisfies

the first requirement above because it is a motor carrier operating in interstate commerce, which

courts define as "the actual transport of goods across state lines **or the intrastate state transport**

**of goods in the flow of interstate commerce.**"  *Id.* (Witt Decl. ¶ 2; *See also Shoemaker v. United*

*Parcel Service, Inc.*, No. 1:10-CV-185-EJL-CWD, 2011 WL 836998, at *8 (D. Idaho Feb. 10,

- 14 -

2011) ("It is undisputed that UPS is a motor carrier that engages primarily in interstate commerce on a national and global scale.").[15]

UPS satisfies the second requirement because Plaintiff engaged in activities of a character directly affecting the safe operation of motor vehicles in interstate commerce. *See, e.g.* (Pl. 64, 69) *See Allen*, 755 F.3d at 283; *see also Shoemaker*, 2011 WL 836998 at *10 (noting that plaintiff "engaged in training for UPS package drivers, such as reinforcing driver methods, determining whether package drivers met minimum driver standards, riding along with package drivers to provide commentary or observations relating to space and visibility requirements, and conducting full-day rides to check performance issues" such that he prepared UPS package drivers for their role in driving in interstate commerce); *Gonzales v. New England Tractor Trailer Training Sch.*, 932 F. Supp. 697, 699 (D. Md. 1996) (finding instructors employed by truck driving school were exempt from the overtime provisions of the FLSA under the MCA). The Motor Carrier exemption "applies regardless of the proportion of the employee's time or of his activities which is actually devoted to such safety-affecting work in the particular workweek." 29 C.F.R. § 782.2(b)(3).

"[D]riving falls squarely into the kind of 'safety-affecting' activity contemplated by the Motor Carrier Act." *Marlo v. United Parcel Service, Inc.*, No. CV 03-04336 DDP, 2009 WL 10669255, at *8 (C.D. Cal. Mar. 19, 2009). In *Marlo*, the court outlined the following features of the UPS On Road Supervisor ("ORS") position which involved a safety-affecting activity: driving, occasionally delivering packages, shuttling packages to drivers and driving during peak season, **noting the ORS could have been called upon to perform these driving duties.** *See id.* at *9

---

[15] The Baker, Gonzales, and Port Allen Centers handle packages being delivered to and from locations outside of Louisiana. (Witt Decl. ¶ 2) Additionally, UPS package car drivers represent the last leg for packages journeying from other states to their final delivery places. (Witt Decl. ¶ 2) Therefore, UPS package car drivers perform deliveries without regard to the origin of the packages, and drive in interstate commerce. (Witt Decl. ¶ 2) Plaintiff generally worked with vehicles exceeding 10,001 pounds. (Edwards Decl. ¶ 12)

- 15 -

("Accordingly, as the undisputed facts show, when Marlo was an On Road Supervisor, Marlo's job required him to engage in safety-related activities from time to time."). In the present case, Plaintiff likewise said he maintained his chauffeur's license, drove package cars for training demonstrations, performed training rides in the package car for weeks, ran delivery routes from time to time (such as in peak season, when packages were missed, or when there was a shortage of drivers), and shuttled packages to drivers—the exact duties supporting the *Marlo* Court's decision. (Pl. 64, 69, 91) Additionally, Plaintiff testified he has been called upon, in the ordinary course of his work, either regularly or occasionally, to perform activities affecting safety. *Id.* at 284. (Pl. 63, 69, 71–73, 75, 84, 85, 259) Thus, Plaintiff is exempt under the Motor Carrier Act.

**b. Plaintiff's Position is Exempt Because he is Also a Bona Fide Administrator or Executive.**

Plaintiff's position is also exempt from the overtime requirements because is a bona fide administrative or executive employee, or a combination thereof. *See* 29 C.F.R. § 541.708. Plaintiff earns well in excess of $455 per week and is paid a predetermined amount on a salary basis. (Edwards Decl. ¶ 7) Plaintiff is subject to the administrative exemption because his primary duties are the performance of non-manual or office work directly related to management policies or general business operations of UPS, including work requiring the exercise of discretion and judgment. *See* 29 C.F.R. § 541.2; *Vela v. City of Houston*, 276 F.3d 659 (5th Cir. 2001). Plaintiff testified regarding the expansive scope of non-manual work he performs, including reviewing telematics, performing observations of his drivers in the office or by following them in a vehicle, and riding with drivers to train them on safety and performance methods, including conducting certifications. (Pl. 63, 69, 70, 71, 72, 73, 74, 76, 77, 80–87) These training, safety, and performance improvement functions are directly related to the management and general business operations of UPS (and also cross over into the executive exemption). *See Lott v. Howard Wilson*

*Chrysler-Plymouth, Inc.*, 203 F.3d 326 (5th Cir. 2000) (noting that Lott's primary responsibilities included, among other things, supervising four employees, coordinating work for subordinates, discipline, evaluating job performance and supervising and training of new employees, which met the administrative exemption).   Plaintiff further admitted in numerous places throughout his deposition that he regularly employed independent discretion and judgment. (*See, e.g.*, Pl. 76, 97, 147, 165–166, 194)   For example, he testified that "[e]very day is different and you have a lot of challenges presented to you and a lot of problem solving." (Pl. 54–55)   Plaintiff noted that his "favorite part of the job is training," specifically "training new drivers how to do things better and seeing them actually apply the methods or the teaching or the training, and the positive experience that can come from that." (Pl. 54)   In discussing his training of employees, Plaintiff said that "there's really a certain style I've developed," and that depending on the driver, he may wait longer to introduce certain methods in order to develop them. (Pl. 85)

Plaintiff's position also qualifies for the executive exemption because his primary duties include the management of a department or subdivision, he directs the work of several employees, and his suggestions as to hiring, firing, advancement, promotion and discipline are given significant weight.  *See* 29 C.F.R. 541.100; *Rainey v. McWane*, 314 F. App'x 693 (5th Cir. 2009). Plaintiff's testimony establishes the elements of the executive exemption.  He testified to receiving supervisory training, particularly on how to administer discipline, which he administers often. (Pl. 43–45, 49, 143; Pl. Exh. 11)  Plaintiff testified that he supervises roughly 15 employees, which currently includes the employees at UPS's customer counter. (Pl. 55, 56, 69 Pl. Exhs. 12, 16, 31, 47)  His specific driver group and the customer counter employees each constitute a "recognized department or subdivision thereof." (Pl. 217); *See Lott,* 203 F.3d at 326; *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554 (2d Cir. 2012) (finding that executive exemption applied to supervisor

- 17 -

of "pickers" who are separated into teams that each perform the same tasks as other teams in the warehouse).

Finally, Plaintiff regularly administers discipline, and his recommendations for hiring, firing and discipline are given significant weight by management. (Pl. 44, 45, 46, 47, 48, 49 50; Hill Decl. ¶ 3); *see also Garrison v. ConAgra Foods Packaged Foods, LLC*, 833 F.3d 881 (8th Cir. 2016) (noting that "team leaders" whose recommendations were given particular weight but who otherwise lacked power to hire or fire anyone nevertheless can be "executives" for overtime purposes).[16] *Rainey*, 314 F. App'x at 696 (affirming summary judgment and noting "the plant's collective-bargaining agreement forbids supervisors from performing basic production labor except in narrow circumstances").

### c. Witt Bears No Individual Liability Under the FLSA.

Plaintiff asserted a FLSA claim against Paul Witt, individually. (Compl. ¶¶ 5, 8) "[I]ndividuals ordinarily are shielded from personal liability when they do business in a corporate form, and . . . it should not lightly be inferred that Congress intended to disregard this shield in the context of the FLSA." *Martin v. Spring Break '83 Prods., L.L.C.*, 688 F.3d 247, 253 (5th Cir. 2012). Plaintiff's sole allegation is that Witt "has a significant level of financial control within UPS, and plays a

---

[16] Plaintiff's other FLSA claims similarly fail. For example, his allegation that UPS engaged in a willful violation is unsupported. "The burden of showing that an FLSA violation was 'willful' falls on the plaintiff [ ]." *Stokes v. BWXT Pantex, L.L.C.*, 424 F. App'x 324, 326 (5th Cir. 2011) "To prove a willful violation, the plaintiff must establish that 'the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by statute." *Ramos v. Al-Batanieh*, 599 F. App'x 548 (5th Cir. 2015) (*citing McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). Plaintiff testified he had no knowledge of whether Witt was involved in the classification decisions. (Pl. 299) Further, UPS's treatment of the On Road Supervisor position as exempt is supported by other courts. *See, e.g., Shoemaker v. United Parcel Serv. Inc.*, 2011 WL 836998 (D. Idaho Feb. 10, 2011) (holding that Shoemaker, who was employed as an On Road Supervisor, was subject to Motor Carrier Exemption); *Marlo v. United Parcel Service, Inc.*, C.D. Cal. Case No. CV03–04336 DDP (March 19, 2009); *In re United Parcel Service Wage and Hour Cases*, B234604, No. 4606, 2012 WL 2356630 at *1 (affirming summary judgment in favor of UPS and concluding that plaintiff, who was an ORS, was an exempt executive employee and choosing not to review "the considerable authority that [Plaintiff's] overtime claims were barred by the Federal Motor Carrier Act."). For similar reasons, UPS acted in good faith and has reasonable grounds for believing its actions comply with the FLSA, especially given that other Courts have already concluded that Plaintiff's position is exempt from the overtime provisions. (*See* Pl. Exh. 10)

significant role in making personnel decisions and setting pay policies." (Compl. ¶ 8)  In addition to being unsupported by evidence, neither of these two assertions are part of the Court's analysis for individual liability. (Pl. 299)  *Gray v. Powers*, 673 F.3d 352, 355 (5th Cir. 2012).  Plaintiff can offer no record evidence that Witt possesses financial control within UPS nor that Witt plays a role in setting pay policies. (Edwards Decl. 4; Witt Decl. ¶ 10)  When asked whether he knew if Witt developed UPS pay practices or classifications, he responded "I don't have working knowledge of those specific aspects of his job."  (Pl. 299)

Plaintiff is unable to demonstrate how the other considerations of individual liability are applicable to Witt.  (Witt Decl. ¶)  *See Martin,* 688 F.3d at 253.  It is undisputed that Witt neither hired Santhuff nor supervised him directly. (Pl. 28–29)  Witt also did not exercise substantial control over the terms and conditions of Santhuff's work outside of occasional involvement in his work assignments and discipline (that resulted in financial consequences), which is irrelevant. (Witt Decl. ¶ 10); *See Martin*, 688 F.3d at 253 ("The power to oversee dispute resolution concerning pay is not determinative of the power to make decisions regarding the rate or method of payment.").  Witt plays no role in personnel decisions outside of his subordinates. (Witt Decl. ¶ 10)  Accordingly, Plaintiff's claim against Witt should be dismissed.

## V.    PLAINTIFF'S CLAIMS UNDER LOUISIANA CIVIL CODE ARTICLE 2315 MUST BE DISMISSED.

Plaintiff alleged that various acts by UPS violate Louisiana Civil Code article 2315, generally. (*See, e.g.*, Compl. ¶¶ 32–33, 35)  This Court has already ruled that such an argument was unfounded. *Story v. Our Lady of the Lake Physician Grp.*, CV. No. 17-651-JWD-RLB, 2018 WL 1902687 (M.D. La. Apr. 20, 2018) (deGravelles, J.).  In *Story*, this Court dismissed the plaintiff's employment claims under Article 2315 and noted its agreement with *Gluck v. Casino Am., Inc.*, 20 F. Supp.2d 991, 992–995 (W.D. La. 1998).  *Gluck* previously held Article 2315 was

inapplicable to causes of action for which the state legislature has set forth a specific remedial scheme, such as employment discrimination claims. *Gluck*, 20 F. Supp. 2d at 995. For these reasons, Plaintiff's claims arising under Article 2315 must be dismissed as a matter of law.

## I.    PLAINTIFF'S PUNITIVE DAMAGES CLAIM FAILS AS A MATTER OF LAW.

UPS is entitled to summary judgment on Plaintiff's claim for punitive damages. An employer is not vicariously liable for punitive damages if it engaged in "good-faith" efforts to comply with federal anti-discrimination laws. *Kolstad v. Am. Dental Ass'n*, 119 S.Ct. 2118 (1999); *EEOC v. E.I. Du Pont De Nemours & Co.*, 480 F.3d 724 (5th Cir. 2007) (applying *Koldstad* in ADA case). UPS's efforts to comply with federal anti-discrimination laws well exceeded what is necessary for the good-faith defense. *See Hatley v. Hilton Hotels Corp.*, 308 F.3d 473, 477 (5th Cir. 2002) (finding the good faith defense applied where employer had a well-publicized policy forbidding harassment, gave training on harassment to new employees, established a grievance procedure for harassment complaints, and initiated an investigation of plaintiff's complaints). Here, UPS took similar steps. It is undisputed that UPS had a written policy prohibiting harassment, Plaintiff and others received training on the policy, UPS had a compliance line and other reporting options for such complaints, and it investigated employee complaints and took remedial action. (Pl. 40–42) UPS made a good faith effort to comply with the ADA and Title VII. Thus, Plaintiff is not entitled to punitive damages as a matter of law.

## CONCLUSION

For the reasons above, Defendants are entitled to judgment as a matter of law, dismissing Plaintiff's claims in their entirety, with prejudice and at Plaintiff's cost.

Respectfully submitted,
**PHELPS DUNBAR LLP**

BY:    */s/ Molly C. McDiarmid*

Susan W. Furr, Bar Roll No. 19582
Molly C. McDiarmid, Bar Roll No. 36426
II City Plaza | 400 Convention Street
Suite 1100
Baton Rouge, Louisiana 70802-5618
Post Office Box 4412
Baton Rouge, Louisiana 70821-4412
Telephone: 225-346-0285
Facsimile: 225-381-9197
Email: susie.furr@phelps.com
   molly.mcdiarmid@phelps.com

ATTORNEYS FOR DEFENDANTS, UNITED
PARCEL SERVICE, INC. AND PAUL WITT

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing Memorandum in Support of Motion for Summary Judgment was filed on this 22nd day of October, 2018 with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all participating counsel of record.

*/s/ Molly C. McDiarmid*
Molly C. McDiarmid

- 21 -

PD.24671298.1