## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**STEVE SANTHUFF**

**CIVIL ACTION**

**VERSUS**

**NO. 17-1404-JWD-EWD**

**UNITED PARCEL SERVICE, INC., ET AL.**

## RULING AND ORDER

This matter comes before the Court on the *Motion for Summary Judgment* (Doc. 24) filed by Defendants United Parcel Service, Inc., ("UPS") and Paul Witt ("Witt") (collectively, "Defendants"). Plaintiff Steve Santhuff ("Plaintiff" or "Santhuff") opposes the motion. (Doc. 38.) Defendants have filed a reply. (Doc. 40.) Oral argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, the motion is granted in part and denied in part.

### I.    Introduction and Summary

The basic facts are not disputed. Plaintiff is employed by UPS as an On Road Supervisor. He suffers from Pigmentary Glaucoma that necessitated a leave of absence from March to July of 2016. When he was ready to return, he requested an accommodation for his disability. While there is some disagreement on what exactly UPS and Plaintiff agreed to, it's undisputed that, upon his return on July 11, 2016, he was assigned to perform supervisory rides with drivers five days a week (as opposed to before his leave, when he only had to conduct these rides two or three days per week). There's a dispute as to how long Plaintiff did this (somewhere between one to three months), but it is undisputed that Plaintiff unilaterally chose to discontinue riding five days a week. UPS accepted his decision, and he remains an employee today doing the same duties he previously performed.

In the instant motion, Defendants move to dismiss all of Plaintiff's claims.  However, Plaintiff only opposes the dismissal of three: UPS's alleged failure to provide a reasonable accommodation in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA") and the Louisiana Employment Discrimination Law, La. Rev. Stat. § 23:301 *et seq.* ("LEDL"), and UPS's alleged failure to pay overtime in violation of the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 *et seq.* ("FLSA").

Having carefully considered the arguments, law, and evidence, the Court will deny the motion as to the ADA and LEDL claims.  Construing the evidence in a light most favorable to Plaintiff and drawing reasonable inferences in his favor, a reasonable jury could conclude that UPS knew of the limitations Plaintiff had with riding a car five days a week (as it related to his eye), was responsible for the breakdown in the interactive process, and failed to provide a reasonable accommodation.  In short, genuine issues of material fact preclude summary judgment.

However, the Court will grant summary judgment on the FLSA claim because of the Executive exemption.  The central question here is whether Plaintiff's "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a).  The Court finds that they are.  That is, all reasonable jurors would conclude—from Plaintiff's own testimony—that his involvement in the disciplinary process was such that his input on firing was given particular weight.

Plaintiff's other claims also warrant dismissal—all because of waiver, and some for other reasons.  Specifically, Plaintiff's claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), fails due to causation.  Plaintiff's claim under Louisiana Civil Code Article 2315 also fails, as it is foreclosed by *Story v. Our Lady of the Lake Physician Grp.*, No.

17-651, 2018 WL 1902687 (M.D. La. Apr. 20, 2018) (deGravelles, J.).  Lastly, Plaintiff's claim

for punitive damages fails because of the good faith defense.

Consequently, all of Plaintiff's claims—except those made under the ADA and LEDL for

UPS's alleged failure to provide a reasonable accommodation—will be dismissed with prejudice.

## II.    Relevant Factual Background

### A.  Plaintiff's Background with UPS and UPS's Investigation into Plaintiff

Plaintiff is currently a UPS employee, working as an On Road Supervisor in UPS's Port

Allen facility. (*Statement of Undisputed Material Facts* ("*SUMF*") ¶ 1, Doc. 24-11; *Plaintiff's*

*Response to Defendant[s'] Statement of Undisputed Material Facts and Plaintiff's Statement of*

*Disputed Facts* ("*PRSUMF*") ¶ 1, Doc. 38-1.)[1]  Plaintiff began his UPS employment in Georgia in

1998. (*SUMF* ¶ 1; *PRSUMP* ¶ 1.)  He moved to Louisiana in 2014, where he began as an On Road

Supervisor in UPS's Gonzales facility. (*SUMF* ¶ 1; *PRSUMP* ¶ 1.)

In fall of 2015, Plaintiff asked to transfer from Gonzales to Baker due to problems he

experienced with a number of Gonzales employees. (*SUMF* ¶ 2; *PRSUMP* ¶ 2.)  Specifically,

Plaintiff claims he was the only supervisor issuing discipline, which caused the Gonzales

employees to resent him. (*SUMF* ¶ 2; *PRSUMP* ¶ 2.)

Plaintiff said his first year in Baker was smooth, but then his boss, Jeff Hill, asked Plaintiff

and other supervisors to improve the drivers' performance. (*SUMF* ¶ 3; *PRSUMP* ¶ 3.)  In

response, Plaintiff increased his disciplinary efforts, causing the Baker employees to resent him.

(*SUMF* ¶ 3; *PRSUMP* ¶ 3.)  Plaintiff said the Baker employees filed grievances against him

because they, like the Gonzales employees, did not want to be supervised as closely as Plaintiff

supervised them. (*SUMF* ¶ 3; *PRSUMP* ¶ 3.)

---

[1] Many of the facts in this case are undisputed.  Generally speaking, when both the *SUMF* and *PRSUMF* are cited, the fact is undisputed, and the statement is taken almost verbatim from the *SUMF*.

In January 2017, Plaintiff learned of approximately eight complaints about his supervision made to the UPS 800 line. (*SUMF* ¶ 4; *PRSUMP* ¶ 4.)  In May of 2017, employees submitted more than 800 line complaints and also submitted a memorandum, complaining of, among other things, unprofessional discipline and that Plaintiff pressured drivers by "soliciting deals and handouts." (*SUMF* ¶ 5; *PRSUMP* ¶ 5.)  The employees asked UPS to investigate Plaintiff. (*SUMF* ¶ 5; *PRSUMP* ¶ 5.)

UPS interviewed Plaintiff and some of the employees involved. (*SUMF* ¶ 6; *PRSUMP* ¶ 6.) Plaintiff does not know who Wilfred Edwards in Human Resources ("HR") spoke to as part of Edwards's investigation. (*SUMF* ¶ 6; *PRSUMP* ¶ 6.) In the investigation, Plaintiff acknowledged that employees had complaints about him and even said one employee called him the "Discipline Monster." (*SUMF* ¶ 7; *PRSUMP* ¶ 7.)  Some employees viewed him as "sarcastic" and "arrogant." (*SUMF* ¶ 7; *PRSUMP* ¶ 7.)  Plaintiff had seen these complaints coming since January 2017. (*SUMF* ¶ 7; *PRSUMP* ¶ 7.)

With respect to the allegations that Plaintiff solicited handouts, Plaintiff admitted to asking one employee, Kevin Shows, to deliver a key to someone along Shows' route. (*SUMF* ¶ 8; *PRSUMP* ¶ 8.)  Specifically, he told Shows to log out of the time system, perform this personal errand for Plaintiff, and then log back in to resume being paid. (*SUMF* ¶ 8; *PRSUMP* ¶ 8.)

Similarly, Plaintiff asked another driver, Wayne Mitchell, to deliver a personal check for Plaintiff along Mitchell's delivery route and to log out and take personal time to perform Plaintiff's errand. (*SUMF* ¶ 9; *PRSUMP* ¶ 9.)  Plaintiff also distributed flyers to his employees before a meeting, asking them to perform free manual labor on his personal property. (*SUMF* ¶ 10; *PRSUMP* ¶ 10.)

4

### B. Disciplinary Acknowledgements Issued to Plaintiff

After the investigation, on June 26, 2017, Paul Witt (West Package Division Manager) sent to Plaintiff a document entitled "Disciplinary Acknowledgement." (*See SUMF* ¶¶ 11, 12; *PRSUMF*¶¶ 11, 12; Pl. Dep., Ex. 53, Doc. 24-5 at 18.) The document stated that the "investigation revealed that [Plaintiff] failed to adhere to some UPS polices and procedures" and then listed some examples. (Pl. Dep., Ex. 53, Doc. 24-5 at 18.) The Disciplinary Acknowledgment then said that Plaintiff's actions were contrary to UPS principles and that he would not be recommended for a Management Incentive Program (MIP) bonus. (Pl. Dep., Ex. 53, Doc. 24-5 at 18; *SUMF* ¶ 11; *PRSUMP* ¶ 11.)

Paul Witt and Wilfred Edwards, in HR, met with Plaintiff to administer the Disciplinary Acknowledgment. (*SUMF* ¶ 12; *PRSUMP* ¶ 12.) During the meeting, Witt realized the acknowledgment contained a typo in the spelling of Kevin Shows' name. (*SUMF* ¶ 12; *PRSUMP* ¶ 12.) Witt asked Plaintiff to hand the document to Witt, but Plaintiff refused unless Witt agreed to give Plaintiff a copy right then. (*SUMF* ¶ 12; *PRSUMP* ¶ 12.) Rather than simply following instructions and letting his manager correct the document, Plaintiff refused to return the document, insisting he would not pass it back until he photographed the document containing the typo. (*SUMF* ¶ 12; *PRSUMP* ¶ 12.)

Witt instructed Plaintiff not to photograph it and again told Plaintiff to return the document. (*SUMF* ¶ 13; *PRSUMP* ¶ 13.) Again ignoring Witt's instructions, Plaintiff photographed the document and still did not hand it to Witt. (*SUMF* ¶ 13; *PRSUMP* ¶ 13.) After refusing several direct instructions, Witt told Plaintiff to leave the property. (*SUMF* ¶ 14; *PRSUMP* ¶ 14.) Plaintiff did so, but he took the document with him. (*SUMF* ¶ 14; *PRSUMP* ¶ 14.)

A week or so later, UPS gave Plaintiff a corrected version of the document (with Shows' name spelled correctly), but it also referenced Plaintiff's insubordination in refusing to return the document, and it increased Plaintiff's discipline to include removal of a salary increase. (*SUMF* ¶ 15; *PRSUMP* ¶ 15.)

Shortly thereafter, UPS decided to transfer Plaintiff, this time to its Port Allen facility, where Plaintiff remains employed today, performing the same job duties he performed in Baker. (*SUMF* ¶ 16; *PRSUMP* ¶ 16.)  Plaintiff said he was initially uncomfortable with the transfer to Port Allen, but he soon became "comfortable" in Port Allen. (*SUMF* ¶ 16; *PRSUMP* ¶ 16.)  Per Plaintiff, his move to Port Allen was again the result of employee complaints about him. (*SUMF* ¶ 16; *PRSUMP* ¶ 16.)

### C.  Plaintiff's Disability and Requested Accommodation

#### 1. Plaintiff's Condition and Initial Request for an Accommodation

Plaintiff suffers from Pigmentary Glaucoma. (*SUMF* ¶ 17; *PRSUMP* ¶ 17.)  In March 2016, Plaintiff said his Pigmentary Glaucoma worsened, which he said caused him to take a medical leave from March to July of 2016. (*SUMF* ¶ 17; *PRSUMP* ¶ 17.)  Plaintiff worked for Jeff Hill, Business Manager, at the time. (*SUMF* ¶ 17; *PRSUMP* ¶ 17.)  Witt supervised Hill. (*SUMF* ¶ 17; *PRSUMP* ¶ 17.)

When Plaintiff was ready to return from his medical leave, he called UPS's 800 line to request an accommodation, and he completed an Accommodation Checklist on June 1, 2016. (*SUMF* ¶ 18; *PRSUMP* ¶ 18.)  Plaintiff stated in his accommodation paperwork, "If I can conduct the job of an [O]n [R]oad [S]upervisor without a requirement to physically deliver routes myself or take over routes then I should not have an excessive physical activity or excessive pigment release/blockage." (*SUMF* ¶ 18; *PRSUMP* ¶ 18.)  Plaintiff also submitted his doctor's statement

saying Plaintiff "should be restricted from exertional physical activity such as heavy lifting." (*SUMF* ¶ 18; *PRSUMP* ¶ 18.)  This letter will be discussed in greater detail below.

Following Plaintiff's submission of this accommodation paperwork, Wilfred Edwards in HR met with Plaintiff to discuss possible accommodations.  (*SUMF* ¶ 19; *PRSUMP* ¶ 19.) Edwards "was polite, professional, and . . . made [Plaintiff] feel comfortable." (*SUMF* ¶ 19; *PRSUMP* ¶ 19.)

### 2. The Alleged Agreed-to Accommodation

On July 6, 2016, Edwards wrote a letter to Plaintiff confirming his meeting with him. (Pl. Dep., Ex. 30, Doc. 24-5 at 9.)  There, Edwards wrote: "To facilitate your continued employment, UPS has offered to implement the following modification to your current position: No delivering packages more than 3 consecutive hours in any given day.  You have stated that this is acceptable." (Pl. Dep., Ex. 30, Doc. 24-5 at 9.)

Plaintiff testified that he responded to the letter. (Pl. Dep. 174, Doc. 24-2 at 21.)  He explained:

> It would have been about the three consecutive hours.  I told him that I understood it to be three hours per day, not just consecutive hours.  And I didn't get a response back to that response.  But I've just been working with it as three hours a day instead of three consecutive hours, because three consecutive hours could be three hours, take a ten-minute break, three more hours, take a ten-minute break, three more hours.

(Pl. Dep. 174–75, Doc. 24-2 at 21–22.)  Plaintiff also testified that he "attempted" to tell someone that he was "not going to do it because it's outside of [his] work restrictions." (Pl. Dep. 175, Doc. 24-2 at 22.)  Thus, Plaintiff said that he agreed to the limitation of three hours, but that he had to clarify after Edwards's letter that he "expect[ed] it to mean three hours per day but not consecutive." (Pl. Dep. 179, Doc. 24-2 at 26.)  Phrased another way, Plaintiff agreed to the wording of Edwards's letter, except for Edwards's use of the word "consecutive."  (Pl. Dep. 179–80, Doc.

24-2 at 26–27.)  Plaintiff also said that he wrote a response about this within a few days of receiving Edwards's letter but that Plaintiff did not receive a response one way or another. (Pl. Dep. 178, Doc. 24-2 at 25.)

### 3. The "New" Job—Riding Five Days a Week

According to Plaintiff, upon his return from months of leave, he was assigned to perform supervisory rides with drivers five days. (*SUMF* ¶ 22; *PRSUMP* ¶ 22.)  Before his leave, Plaintiff said he rode with his drivers two to three days per week. (*SUMF* ¶ 22; *PRSUMP* ¶ 22.)  Plaintiff complained to Hill and Edwards that he should not have to ride five days per week, but Edwards advised Plaintiff that riding five days per week was within the regular duties of his position. (*SUMF* ¶ 23; *PRSUMP* ¶ 23.)  Plaintiff's duties included these rides, and his job did not prescribe a maximum number of days an On Road Supervisor must perform these rides. (*SUMF* ¶ 24; *PRSUMP* ¶ 24.)

In his deposition, Plaintiff testified that, when he returned from leave, he began having to make rides every day and every week. (Pl. Dep. 192, Doc. 24-2 at 36.)  He complained to Hill and was told that "that was [his] new job"—"my new job was to ride five days a week." (Pl. Dep. 192, Doc. 24-2 at 36.)  Elsewhere, Plaintiff said he told Hill that this was outside his restrictions, and he was told to work within them, which he tried to do. (Pl. Dep. 176, Doc. 24-2 at 23.)  Plaintiff testified:

> I did do it in the sense that I minimized my physical impacts and potential damage. I took longer to do things, you know.  If there was four or five hours['] worth of work, I did things where I wouldn't cause, you know, the stress level to go up and the increase in my eye pressure.  I was presented with the work that needed to get done, but I haven't made an issue of that.  That's not a complaint that I'm making.

(Pl. Dep. 176, Doc. 24-2 at 23.)

### 4. Plaintiff Stops Riding Five Days a Week—His Own Account, Generally

#### a. Plaintiff's Explanation, from his Deposition

Notably,  Plaintiff alleges this period of riding five days a week only lasted for a brief period from July 11, 2016 to August or September 2016. (*SUMF* ¶ 24; *PRSUMP* ¶ 24.)  Thereafter, Plaintiff returned to riding fewer days. (*SUMF* ¶ 24; *PRSUMP* ¶ 24.)

More specifically, Plaintiff testified that, after two and half to three months, "there came a point in time when [he] was fed up with being on a car five days a week, and [he] was sore." (Pl. Dep. 209, Doc. 38-2 at 16.)  Plaintiff said: "My back was hurting.  I didn't have a specific injury that I needed to report, but my legs – the circulation in my legs were cut off. My back was hurting. You're sore. You can't – in one weekend, you can't really recover." (Pl. Dep. 209, Doc. 38-2 at 16.)  Defendants emphasize that Plaintiff complained that riding two "extra" days per week hurt his back and legs but he admitted he had no disability related to his back or legs. (*SUMF* ¶ 25; *PRSUMP* ¶ 25.)

Plaintiff testified that he told Hill " ' I'm not going to keep riding on a car because I am physically in pain from riding on a car every day.' " (Pl. Dep. 210, Doc. 24-2 at 47.)  After this, Plaintiff "went back to being in the office and doing [his] job like [he] always [did], or like [he] did before." (Pl. Dep. 211, Doc. 24-2 at 48.)  Plaintiff would ride some days, but he "went back to managing [his] job like it had been before the ADA request." (Pl. Dep. 211, Doc. 24-2 at 48.)  Plaintiff testified:

Q.      And you had no evidence that riding in the car did anything to injure your eyes, correct?

A.      I have no evidence.  I'm not making the claim.  I know that it's potentially detrimental, but I don't know that there's any evidence that any expert witness can provide one way or the other.

Q.      So was your problem with riding in the car that it was affecting the rest of
        your body, not your eyes?

A.      Both. Both.  I felt like it was affecting my eyes, but you had asked me if I
        had any evidence.

        I don't have any evidence other than my vision has deteriorated.  But
        I don't have specific evidence that riding in the car has caused me more
        trouble with my eyes, just the fact that it can or potentially could.

        And then also, yes, on the physical pain, there's really no time to
        recover from five days a week, every week.  It causes a lot of strains, not
        just to me. Other people agree. It's kind of – it's a problem when you're on
        the car too much with that seat.

(Pl. Dep. 211–12, Doc. 24-2 at 48–49.)

Plaintiff also disputed that riding in the car five days was consistent with his job
restrictions; he said that, when he agreed to the accommodation, he was "thinking about [his]
former job where [he] didn't have to do such a thing [as riding in the car five days].  [Plaintiff]
wasn't anticipating that [he] could be assigned to do that[] [because] [a]ny jarring or physical
activity, getting in and out of the car, getting in and out of a car potentially can cause [him] a
problem." (Pl. Dep. 212, Doc. 24-2 at 49.)

### b.  Plaintiff's Letter to Witt and Edwards

Plaintiff  also testified about a letter to Witt and Edwards. (Pl. Dep., Ex. 38; Pl. Dep. 222,
Doc. 24-3 at 2.)  Plaintiff said the information in the letter was accurate. (Pl. Dep. 222, Doc. 24-3
at 2.)  In the letter Plaintiff said:

Since returning from my disability there is a problem in that I have not returned to
my old job as expected with an accommodation but I have entered into a newly
created assignment that was not explained to me and that was not requested and not
expected.  I hope and believe this can easily be resolved reasonably as it should be
of no trouble for us to agree on a beneficial resolution or trial attempt.  It seems that
after an ADA accommodation agreement and letter I have returned to work in a
capacity of a newly created position that is more detrimental to my overall health
and more detrimental to my specific medical condition then (sic) the position I held
for most of the past 18 years, and prior to even making any such request for an
accommodation.  In other words, I am much worse off in this newly created position

10

then (sic) I would have been in my former position without any accommodation request at all. Yet, I still need a minor accommodation to maintain my eyesight and not go blind. In this new position I am now verbally instructed or verbally assigned to ride in the passenger "jumpseat" (sic) of a UPS car for five days a week, week after week, conducting our full "Space and Visibility" Training Rides even when all such rides are caught up and no longer expired. My prior job averaged no more then (sic) 30-40 days annually on the car (driving or as a passenger which varied). Where as (sic) this newly created job requires most of the day (approximately 90% or more) in the jump[s]eat every day, day after day, Monday through Friday.

There is not a position such as this in UPS and although one on the outside might think that creating an accommodation position would be very beneficial and helpful to the employee, I find that perhaps the creation and assignment to ride everyday on a plywood seat with little to no cushion and vertical at 90 degrees and completely uncomfortable to be either malicious or retaliation or born out of a misunderstanding of my situation or some opinion that my request may be invalid or exaggerated.

Regarding the chain of command, I have spoken to my manager, Jeff Hill, about this matter. I sent an email without response earlier this week. I sent a text message Wednesday this week, without response. And I started a conversation on 7/21/2016 where the response was that he was not going to ask me to deliver more than 3 hours or lift more than 150 pounds and that UPS was meeting my accommodation request. I expressed that there was still a problem.

I am not sure who made the decision to assign me to ride in the jump seat for 5 straight work days each week but this is excessive. It's not required of any supervisor anywhere basically for the reason that after a few days it becomes very difficult to recover from the strains it puts on the body. It is way more detrimental to my medical eye condition then (sic) my former job had I never even made any accommodation request. I am sure that anyone in UPS management that has worked in our "Package Operation" would agree that after a few days riding in a jumpseat (sic) you need a break for your health.

Separate from my medical condition with my eyes, the plywood jumpseats (sic), even when new and fully cushioned, tends to reduce circulation in the legs from the leading edge of the seat pressure on the back of the thighs. The seats in various cars strain the leg muscles from holding the legs wide and tense to maintain a vertical position of the body to avoid back injury. . . . The constant movement in this type of seat causes strain on the lower back. All of this that I describe has although been uncomfortable over the years, has never been in such an excess that my body could not recover following one, two, or three days riding. But now after 9 consecutive weekdays on the car I am very sore and feel many pains throughout my body. I do

not believe I have sustained any injury at this point but all of the details I describe above are a concern for me in this newly created position, not only for my eye health but for the rest of my body.  Any damage to my eyes must be evaluated by a pressure test in a doctor[']s office as I cannot generally detect an elevation in pressure until it [ ] changes the shape of my eye which then changes the vision.  On Wednesday this week . . . my pressures were tested and were above normal high on full medication, which leads to blindness.

. . . .My ADA request simply amounted to asking UPS to refrain from requiring excessive physical activity which is typically and often a violation of our union negotiated contract.  I stated that I can conduct all of the essential functions of my job that are typical and normally encountered through out (sic) the day.  My doctors['] restrictions (from Ayla and Morgan) in the ADA request were "NO excessive physical activity."  I suggested in my ADA request that physical activity such as that of a UPS driver be limited to 2 hours per day.  I want to work for UPS and I wanted to work in my former position. The letter came to me through email from Wildred Edwards (not by mail) and acknowledged that I would not be asked to perform physical work beyond 3 hours per day, though it's worded no more than 3 consecutive hours, I construe it to mean no more than 3 total hours in a day as I expect UPS would also construe it to mean 3 hours total in a day.

. . . My eye condition is that of Pigmentary Glaucoma.  I have severe uncontrolled Glaucoma on maximum medication and it is uncontrolled in the sense that the medication is not controlling the level of damaging pressure that leads to blindness. The curvature of my eyes inside result in the coloration (green and blue) pigment cells rubbing off and clogging the drainage.  Fluid is constantly being produced in all eyes and in my eyes the drainage is blocked.  The cells are removed and become free floating by action of my pupil and by physical activity and jolting or bumping. That is why excessive physical activity is detrimental to this condition "Pigmentary Glaucoma."  Riding on a package car in excessively bumpy roads contributes to the problem.  Riding for 5 days a week, weekly, when it's not even necessary for the business is very aggr[a]vating to my condition.

. . . I propose that now the center is caught up in the expired safety training rides that I be given either my old assignment with the accommodations already offered or the new assignment / the same assignment where I ride instead of day after day, to no more then (sic) 2-3 days per week as needed for business purposes and the remaining days I conduct training observation of the drivers as UPS already has an established observation procedure and requirement in our package center operations (or work as instructed in the daily operation of the center when off the car).  I feel that limiting my exposure to the package jumpseat (sic) to just 2-3 days per week (or less) as needed for training would likely be a reasonable accommodate (sic) to my medical condition and meet the needs of the company.  It would allow

my body time to naturally recover and limit the amount of Pigment release and detriment to my eye condition. At this time however I am not absolutely certain that my suggestion will meet the needs of my eye health but I would like UPS to reduce their demand that I ride in a jumpseat (sic) daily everyday and I would like a trial period to determine if my eye health can sustain a reasonable amount of time in a jump seat as my eye health cannot handle the newly created position.

As a special note: I have inquired to my manager and suggested all of this to my manager and it was explained to me that my job entails daily riding for full days every day even beyond the point where training was no longer expired.

It is my sincerely hope (sic) that this request can be met and can be implemented immediately.  I await a response as soon one can be made available. (sic).

Sincerely, Steve Santhuff.

(Pl. Dep., Ex. 38.)

### c.  Plaintiff's Medical Evidence?

Of this letter, Plaintiff admitted that he did not "attach any medical opinions or new medical information." (Pl. Dep. 222, Doc. 24-3 at 2.)  Plaintiff said, "Correct, I did not.  I was simply describing that what was happening wasn't the agreed-upon ADA accommodation." (Pl. Dep. 222, Doc. 24-3 at 2.)  Plaintiff was asked whether riding five days a week was inconsistent with the agreed accommodation, and he explained that, when he evaluated the ADA accommodation, he did so "based on the job as [he'd] always known it and not a newly created job." (Pl. Dep. 222, Doc. 24-3 at 2.)  Plaintiff did not indicate in his paperwork that "there was any limitation to [his] riding in the vehicle and performing observations" because he "didn't know that was a potential job that [he] would be facing." (Pl. Dep. 222–23, Doc. 24-3 at 2–3.)  Plaintiff did not have a problem riding in a car a couple of days a week; he had a problem with five. (Pl. Dep. 223, Doc. 24-3 at 3.)  But Plaintiff did not note this limitation "because [his] job did not require more than [he] was evaluating." (*Id.*)

Defendants point to the fact that, after submitting Plaintiff's initial information and accommodation checklist, he never submitted additional medical information to UPS. (Pl. Dep. 174, Doc. 24-2 at 21.)   For example, Plaintiff testified that he did not "submit any medical information to UPS that would indicate that riding in the car five days a week was not allowed" because: "I didn't want to keep causing problems." (Pl. Dep. 213, Doc. 38-2 at 17.)   Defendants also refer to the following testimony:

> Q.    And so at no point in time did you go back and start the accommodation process again and submit revised medical paperwork or anything, correct?
>
> A.    I have not.
>
> Q.    Why did you not do that?
>
> A.    Because I don't know that there's a reason to resubmit.  I mean, I like the job. I want to work the job. I can work the job as we originally agreed. I think if I made any additional requests, it would be slightly beyond the expectations of the job.   I think I can get the job done with these accommodations.
>
>        And the rare instances where I was asked to maybe exceed or presented with a larger workload that I thought could accommodate it was rare, and I made it known that I objected.  And I think that by making it known that I objected, I wasn't asked to do that much more.

(Pl. Dep. 180–81, Doc. 24-2 at 27–28.)

Similarly, Plaintiff was also asked why he didn't submit medical documentation showing that his condition was affected by movement or jarring, and he replied:

> I didn't have any – I didn't try to obtain support from a doctor on that.  I didn't want to go through an ADA change because of the issues that came about afterwards.  I mean, I felt what I experienced afterwards with this accommodation was a problem for me, and I just wanted to try to leave things alone and let things --- let things work themselves out.

(Pl. Dep. 184, Doc. 24-2 at 30.)  Plaintiff was asked if he was talking about "a shift in [his] job duties," and he said: "Right, or the riding on the car five days a week, which ultimately was an

14

excessive – additional workload, because I was also asked to acknowledge that I still had all of my old responsibilities as well." (Pl. Dep. 184, Doc. 24-2 at 30.)

However, Plaintiff emphasizes in his opposition that he did in fact have medical evidence. (Doc. 38 at 1 n.1.) Specifically, and as stated earlier, Plaintiff submitted a letter with his original request for an ADA accommodation from Dr. Morgan. (*See* Pl. Dep., Ex. 29, Doc. 24-4 at 41, Doc. 38-2 at 27.) In that letter, Dr. Morgan said that Plaintiff's "type of glaucoma can be made worse by physical activity." (Pl. Dep., Ex. 29, Doc. 38-2 at 27.) Further, Dr. Morgan stated that Plaintiff "should be restricted from exertional physical activity such as heavy lifting. This restriction should be considered life long." (Pl. Dep., Ex. 29, Doc. 38-2 at 27.) Thus, while Plaintiff did not have any additional medical documentation to complement his own letter, Plaintiff did have this original doctor's note.

### d.   Plaintiff's Other Evidence about this "Accommodation"

Plaintiff also submits two declarations to support his arguments on the accommodation issue. Defendants object to most of these declarations, but the Court finds some of the information relevant and admissible.

For example, Darin Williams was Plaintiff's Business Manager and supervisor from February 2015 to November 2015. (Pl. Ex. ¶ 2, Doc. 38-3.) Williams stated:

> In regard to riding on the car with drivers, it is not customary for any supervisor to ride 5 days a week in order to be successful, and UPS actually wants a minimum of 1 day scheduled off the car for Center Planning Meetings. In most cases, the supervisors would ride less than 3 days a week.

(Pl. Ex. ¶ 4, Doc. 38-3.) While Defendants are correct that Williams was not Plaintiff's supervisor while these events transpired, his testimony is still relevant to provide context for what UPS's practices had been at other points in Plaintiff's employment at UPS.

Similarly, Ron Lethermon is another On Road Supervisor who reported to Hill in the Baker center. (Pl. Ex. ¶ 2, Doc. 38-4.)  Lethermon stated that, after they "caught up on the safety rides, [Plaintiff] was still required to ride with drivers daily, five days per week." (Pl. Ex. ¶ 4, Doc. 38-4.)  Further, Plaintiff "would miss center planning meetings due to having to be riding with drivers." (Pl. Ex. ¶ 5, Doc. 38-4.)  Lethermon, who testified based on his "own personal knowledge," said Plaintiff "rode with drivers more than any of the other full time supervisors in the summer and fall of 2016." (Pl. Ex. ¶¶ 1, 6, Doc. 38-4.)  Defendants object that these statements are based on hearsay and without personal knowledge, but the Court will overrule them; it is reasonable to infer that one of Plaintiff's co-workers would have personal knowledge of these matters without receiving the information from hearsay.

### e. Plaintiff Stops Riding Five Days a Week—Defendants' Account, Generally

When Plaintiff unilaterally chose to discontinue riding five days a week, no one criticized him. (*SUMF* ¶ 44; *PRSUMF* ¶ 44.)  Further, Plaintiff's relationship with Hill is "fine," and Plaintiff thinks Hill is "genuinely comfortable working with [him] and talking with [him] . . . ." (*SUMF* ¶ 45; *PRSUMF* ¶ 45.)

Defendants also provide declaration testimony regarding Plaintiff's problems with performing the rides. Specifically, Hill testified that:

> At some point, [Plaintiff] came to me about not wanting to perform supervisory rides five days per week. In response, I asked Wilfred Edwards, Human Resources, whether we needed to change [Plaintiff's] instructions.  Edwards told me [Plaintiff's] work restrictions did not relate to riding in the passenger seat of the vehicle, and he said he believed the instruction was proper since these supervisory rides were part of [Plaintiff's] duties.  Since the supervisory rides did not violate his work restrictions, I continued to instruct [Plaintiff] in the way that was most useful to the Baker center.  I told [Plaintiff] that riding was within the parameters of his work restrictions and that he would need new work restrictions if this was a problem for him.

16

(Def. Ex. B. ¶ 8, Doc. 24-6 at 3.)  Edwards similarly declared:

> I *believe* I spoke with [Plaintiff's] supervisor, [ ] Hill, and advised him that riding five days per week was consistent with [Plaintiff's] position and that his medical paperwork gave no indication that supervisory rides in which [Plaintiff] did not deliver or lift packages were unacceptable.  Hill gave me the impression that the supervisory rides were needed for business reasons.

(Def. Ex. C ¶ 11. Doc. 24-7 at 3 (emphasis added).)  Lastly, Hill said:

> I previously was an On Road Supervisor and in my capacity as [one], I sometimes rode in the package car for training purposes five days a week.  Additionally, I *believe* other On Road Supervisors rode on the car many days of the week (possibly five days a week) to conduct training, OJS and S&V rides, or for other purposes.

(Def. Ex. B ¶ 9, Doc. 24-6 at 3 (emphasis added).)

Plaintiff objects to the admissibility of all statements made "on belief." (*See, e.g., PRSUMF* ¶ 36.) The Court agrees that, under Federal Rule of Civil Procedure 56(c)(4), a "declaration used to support . . . a motion must be made on personal knowledge," and statements made "based on information and belief" do not satisfy this requirement. *See Richardson v. Oldham*, 12 F.3d 1373, 1378 (5th Cir. 1994) (citation omitted).  However, the Court's ruling does not rest on the exclusion of this evidence, so it is ultimately immaterial.

In any event, Defendants also devote their attention to the Space and Visibility (S&V) ride, which "is an annual certification" involving a "ride that a supervisor conducts to . . . monitor performance of certain functions by the driver" for "safety related items." (Pl. Dep. 74–75, Doc. 24-1 at 34–35.)  Again, Plaintiff stated that he had ridden two to three days a week but that his problem was doing it five days a week. (Pl. Dep. 223, Doc. 24-3 at 3; *see also SUMF* ¶ 38 ("Plaintiff concedes that conducting S&V rides and performance rides were part of his regular duties and that he rode with drivers two to three days per week for this purpose before his leave."); *PRSUMF* ¶ 38 (not disputing this part of *SUMF*).)

17

Hill testified that, during the few months in which Plaintiff took medical leave in 2016, Hill "was short-handed with respect to On Road Supervisors." (Def. Ex. B ¶ 5, Doc. 24-6.) Hill said: "Another On Road Supervisor was riding many days per week, including five days per week at times, in order to cover training and certification rides with drivers. Despite his efforts, the Baker center was significantly behind on Space and Visibility (S&V) rides." (Def. Ex. B ¶ 5, Doc. 24-6.) Hill testified further that, after Plaintiff returned in July 2016, Hill "instructed [Plaintiff] to perform supervisory rides in the package car to help the Baker drivers catch up on [their] S&V rides. [Hill] spoke with Paul Witt, [his] boss, about this instruction, and [Witt] agreed it was necessary to address the delayed S&V certifications." (Def. Ex. B ¶ 5, Doc. 24-6.) Hill declared: "I expected this assignment to last for approximately three weeks. I believe On Road Supervisor's rides, including [Plaintiff]'s rides, with drivers generally improve their performance." (Def. Ex. B ¶ 5, Doc. 24-6.) Hill also declared that his decision concerning Plaintiff's rides "was motivated solely by the business needs of the Baker center, specifically the need to catch up the S&V rides that were behind and/or past due. This decision had nothing to do with [Plaintiff]'s eye problems or with [Plaintiff] taking leave." (Def. Ex. B ¶ 7, Doc. 24-6.) Hill further explained, "If [Plaintiff] performed additional rides besides S&V rides, those would have also been based on the needs of the center. We were short-handed prior to his return, and it would make no sense for me to instruct [Plaintiff] to perform unnecessary duties, nor did I do so." (Def. Ex. B ¶ 7, Doc. 24-6.) Plaintiff infers from these last two sentences that Hill acknowledges that Plaintiff performed rides other than the S&V rides during his five-day-a-week riding assignments. (*PSUMF* ¶ 37.)

Witt similarly testified that, when Plaintiff returned from medical leave, "certain certifications needed to be conducted with the drivers, specifically S&V certification rides." (Def. Ex. D ¶ 5, Doc. 24-8.) According to Witt, "[he] knew that [Plaintiff] was instructed to conduct

S&V rides each day after his return, for what [he] recall[s] estimating would be a period of approximately eight to ten days in order to catch up the outstanding S&V rides." (Def. Ex. D ¶ 5, Doc. 24-8.)   Witt further said: "It was never my understanding that he would drive every day for any purpose other than conducting the outstanding S&V rides.  If he was assigned to perform any other rides, I do not believe I participated in that decision." (Def. Ex. D ¶ 5, Doc. 24-8.)   Again, Plaintiff objects to Witt's "belief," but this too is ultimately immaterial. (*PSUMF* ¶ 37.)

Defendants also emphasize that, "[c]onsistent with his restrictions, Plaintiff was relieved from having to load or shuttle packages while performing these supervisory rides." (*SUMF* ¶ 40; *PRSUMF* ¶ 40.)  Similarly, it is undisputed that "[d]rivers needed to catch up on outstanding S&V certifications following [Plaintiff]'s absence" and that "Plaintiff said he was able to catch up these near-expiring S&V certifications by riding five days per week." (*SUMF* ¶ 42; *PRSUMF* ¶ 42.) Lastly, Plaintiff does not dispute the facts that "Plaintiff's continued riding, if at all, accomplished legitimate driver training purposes" and that "Plaintiff acknowledged his performance rides significantly improved the drivers' performance." (*See SUMF* ¶ 43; *PRSUMF* ¶ 43 (not disputing those portions of *SUMF*).)

### 5. Plaintiff Stops Riding Five Days a Week—Plaintiff on the OJS Certifications

Plaintiff was also asked why he had to do the OJS certifications and ride five days a week, and he responded that "[Hill] never – never gave me any specific assignment on a certification. He would either assign me to ride with a driver or he would ask me who I was going to ride with." (Pl. Dep. 205, Doc. 24-2 at 45.)  More importantly, Plaintiff said: "Once I completed all of the safety rides, I was riding every week without purpose.  And I chose to generate the work product from my job, which, since the safety rides had been done, I did the performance rides because my new job was ride every day." (Pl. Dep. 205, Doc. 24-2 at 45.)  Plaintiff continued:

Q.     You said you were riding without a purpose.  So you would just ride.  You wouldn't give coaching or feedback or anything?

A.     Oh, no.  I would do my job when I rode.  It got to a point where there was no need for me to ride.  I completed all the space and visibility rides that were due for that year, basically, or for a large portion of the time, and then I just had a job to ride.  So I wasn't going to just ride and come home with nothing or come back with nothing.

So I did performance rides because I felt like if I don't show that I'm performing my job and turning in a work product at the end of the day to show for the ride, then I wouldn't be doing my job.

But if you go anywhere in the nation, there's no supervisor that's going to have every single one of the drivers locked in with an OJS certification.

Q.     And how do you know that? You're just speculating, correct?

A.     Yeah.  But all my colleagues in Atlanta that I have worked with, my colleagues here, you know, the other supervisors weren't doing three-day lock-in rides very routinely, maybe one or two a year, and here I was doing them every week.

(Pl. Dep. 208–09, Doc. 38-2 at 16.)

Again, Hill assigned him to ride "every day"; "Hill didn't assign [Plaintiff] to get the lock-in certifications on every single driver." (Pl. Dep. 206, Doc. 38-2 at 16.)   Hill would not "engage in a conversation" with Plaintiff about these new duties and eventually responded to Plaintiff's text messages with: "Your new job is to ride five days a week." (Pl. Dep. 206–07, Doc. 38-2 at 16.)  Hill would not tell Plaintiff the reason for this new job. (Pl. Dep. 207–08, Doc. 38-2 at 16.)

### 6. Other Evidence from Defendants Allegedly Showing There Was No Discrimination

Defendants also refer to the fact that, as evidence of the discrimination he suffered, Plaintiff pointed to information he heard from someone else that Witt told a manger to assign Everett Ozenne to ride five days a week coming back from short-term disability. (Pl. Dep. 101–02, Doc.

24-1 at 49–50.)  But Plaintiff acknowledged that Ozenne "didn't have to end up working with five days." (Pl. Dep. 302–03, Doc. 24-3 at 42-43.)  In his opposition, however, Plaintiff says that UPS's denial of a reasonable accommodation to him was evidence in itself of discrimination.

Defendants also highlight other facts that purportedly show there was no discrimination. For example, no one in management, including Witt and Hill, made negative comments whatsoever about Plaintiff's health, his eyes, or anything health-related. (*SUMF* ¶ 48; *PRSUMF* ¶ 48.)  Further, Plaintiff received all approved leaves of absence that he sought, and no one commented negatively about Plaintiff taking those leaves. (*SUMF* ¶ 49; *PRSUMF* ¶ 49.)  Plaintiff believes most supervisors had problems with Witt. (*SUMF* ¶ 50; *PRSUMF* ¶ 50.)  Plaintiff believes Witt might have issues with Plaintiff because Witt was friends with Blane Daze (with whom Plaintiff had disagreements) and Plaintiff supported Williams. (*SUMF* ¶¶ 50, 51; *PRSUMF* ¶¶ 50, 51.)

Defendants also discuss Plaintiff's discipline.  Specifically, Plaintiff was asked whether there was anything that happened to him that was negative after his ADA request (other than his having to ride five days a week), and Plaintiff responded:

> The issue with the Mike Beuche letter and the removal of my money, and the meeting – the first meeting with [Witt] where he removed the money, and what happened after that meeting and then what happened after that meeting with the second meeting, removing my salary merit increase, which ultimately didn't exactly happen.  I guess [Witt] wasn't successful with having all of it removed, but I ended up getting a 1-percent salary increase.

(Pl. Dep. 190, Doc. 24-2 at 35.)  Elsewhere, Plaintiff testified that several employees filed grievances or complained about him for "resisting [his] discipline of them." (Pl. Dep. 159, Doc. 24-2 at 10.)  Plaintiff also talked about the problems Beuche had with him, even though Beuche wasn't his employee. (Pl. Dep. 249, 251, Doc. 24-3 at 13–14.)  Defendants argue in their *SUMF* that Plaintiff's "discipline directly followed complaints by employees to management (usually

because of discipline Plaintiff issued), which had nothing to do with his health condition" (*SUMF* ¶ 52), but, as Plaintiff correctly explains, the statements Defendants point to here "do not make any link between [the employee complaints] and the discipline issued to" Plaintiff. (*PRSUMF* ¶ 52.)

Plaintiff was also asked at his deposition if he had "any evidence that anybody in UPS management encouraged [ ] Beuche to make the complaints that he made or encouraged any of the other people who made complaints against [him] at this time to have the complaints," and Plaintiff responded that he did have evidence: "I have [ ] Beuche acknowledging on a tape recording that he was solicited the letter from my superiors." (Pl. Dep. 267, Doc. 38-2 at 20.)  Specifically, Beuche came to Plaintiff to discuss some issues, Plaintiff recorded the conversation, and then Beuche "ended up making a statement that [Plaintiff's] superiors solicited the letter from him." (Pl. Dep. 268, Doc. 38-2 at 20.)  Beuche "said he was asked to write a letter", and Plaintiff said that he did not elaborate as to whether he "was asked to write the letter . . . because he had been complaining and they wanted him to reduce it to writing." (Pl. Dep. 271, Doc. 38-2 at 21.)

Finally, although Plaintiff underwent a subsequent surgery in 2017, he said he never needed a change in his work restrictions, which are still being accommodated today. (*SUMF* ¶ 31; *PRSUMF* ¶ 31.)  UPS accommodated Plaintiff's only restrictions. (*SUMF* ¶ 31; *PRSUMF* ¶ 31.)

### D.  Facts Related to Title VII

#### 1. Evidence Related to Exhaustion

Plaintiff first contacted the EEOC on July 6, 2017. (*SUMF* ¶ 34; *PRSUMF* ¶ 34.)  On that day, Plaintiff sent a letter to the EEOC complaining of "Discrimination, Retaliation and Harassment, unwarranted threats of termination. Fraud and Dishonesty, [and] Defamation of Character." (Def. Ex. E, Doc. 24-9.)  In the letter, Plaintiff complains, among other things, of being

retaliated against for supporting his former boss and manager Williams, who was ultimately terminated for reasons unrelated to Plaintiff's testimony. (Def. Ex. E, Doc. 24-9.)

Subsequently, on July 25, 2017, Plaintiff submitted an EEOC charge claiming he was "discriminated against because of [his] disability and retaliated against in violation of the Americans with Disabilities Act; as amended." (Pl. Dep., Ex. 74, Doc. 38-2 at 31.)  Plaintiff makes no mention in his EEOC charge of Williams or Title VII. (Pl. Dep., Ex. 74, Doc. 38-2 at 31.)

The EEOC mailed a Notice of Right to Sue (requested by Plaintiff) on August 1, 2017. (*SUMF* ¶ 33; *PRSUMF* ¶ 33.)

Plaintiff returned to work on July 11, 2016, and he testified that he rode in the jump seat until August or September, 2016, but he is not sure of the date. (*SUMF* ¶ 35; *PRSUMF* ¶ 35.)

Hill stated in his declaration: "On August 12-13, 2016, the Baton Rouge area experienced a major flood that severely affected and interrupted the Baker center's operations.  As a result, I *believe* [Plaintiff] did not perform S&V rides during or shortly after the flood." (Def. Ex. B ¶ 6, Doc. 24-6 (emphasis added).)

Plaintiff disputes this on two grounds.  First, Plaintiff contests the admissibility of Hill's declaration because he said he "believe[d]" this fact. (*See PRSUMF* ¶ 36; *supra*.)  Second, Plaintiff testified  that he rode five days per week for two and a half to three months after his return to work on July 11, 2016. (Pl. Dep. 230, Doc. 24-3 at 5.)  This would put him engaging in such activity some time between September 26 and October 11, 2016. (*See* Pl. Dep. 230, Doc. 24-3 at 5.)  Plaintiff also said he talked to Hill about his riding every day, and Hill "wouldn't engage in a conversation" and told him "[y]our new job is to ride five days a week." (Pl. Dep. 206–07, Doc. 38-2 at 16.)

## 2. Evidence Related to Retaliation

In September of 2016, Plaintiff received a Disciplinary Acknowledgment for allowing driver DOT violations, but his MIP reward in 2017 was not impacted as a result. (Pl. Dep. 236, Doc. 38-2 at 19.) However, this document did have an impact in that "Witt referred to this document and this action in his discipline of [Plaintiff] or punishment of [him] when he removed money from [Plaintiff] from the July 2017 meeting." (Pl. Dep. 236, Doc. 38-2 at 19.)

In 2016, Plaintiff received a MIP bonus of $7,356.75 and a salary increase. (*SUMF* ¶ 56; *PRSUMP* ¶ 56.) Although Plaintiff believes his bonus and salary were impacted for 2017, his payroll records show that for 2017, he received a pay increase and a MIP bonus of $5,315.77. (*SUMF* ¶ 56; *PRSUMP* ¶ 56.) Plaintiff has no evidence of what pay increase was customary in 2017. (*SUMF* ¶ 56; *PRSUMP* ¶ 56.)

Further, Plaintiff testified that, as of July 28, 2016, he had not experienced any discipline from Hill or Witt. (Pl. Dep. 231, Doc. 24-3 at 6; *SUMF* ¶ 57; *PRSUMF* ¶ 57.)

It is undisputed that the statements Plaintiff made relating to Darin Williams were not given in connection with a Title VII investigation of discrimination. (*SUMF* ¶ 58; *PRSUMF* ¶ 58.) It's also undisputed that Plaintiff's statements related to an investigation of a policy violation by his supervisor. (*SUMF* ¶ 58; *PRSUMF* ¶ 58.) However, Plaintiff urges that both of these statements are immaterial, as UPS "ultimately fired Darin Williams in violation of Title VII and based ostensibly on the investigation in which it solicited statements from [Plaintiff,] which 'investigation' was a sham and pretext for unlawful discrimination against . . . Williams in violation of Title VII." (*PRSUMF* ¶ 58.)

In any event, it is also undisputed that the gap between Plaintiff's 2015 Williams statements and his 2017 discipline (that allegedly affected his pay) was approximately two years. (*SUMF* ¶

59; *PRSUMF* ¶ 59.)  The only information Plaintiff said UPS tried to elicit from Plaintiff for the Williams statement was "the exact dates, times, and length of times," and Plaintiff's statements about Williams's conduct were part of the basis for discipline against Williams. (*SUMF* ¶ 60; *PRSUMF* ¶ 60.)  Further, no one said anything negative to Plaintiff about his statements in the Darin Williams matter. (*SUMF* ¶ 62; *PRSUMF* ¶ 62.)

Additionally, several employees filed grievances related to Plaintiff and the discipline he issued. (*See* Pl. Dep. 146, 187, Doc. 24-2 at 7, 32; Pl. Dep., Ex. 14, Doc. 24-4 at 32–35.)  Further, as detailed above, some employees also said Plaintiff asked them to do favors; Plaintiff did not dispute they said this but rather said: "they both said that they would help me both times that they were asked." (Pl. Dep. 262, Doc. 24-3 at 24.)

### E.  FLSA Evidence

#### 1. Evidence Related to the Motor Carrier Exemption

UPS is a motor carrier operating in interstate commerce, and UPS transports goods across state lines in the flow of interstate commerce. (*SUMF* ¶ 63; *PRSUMF* ¶ 63.)

The Baker, Gonzales, and Port Allen Centers handle packages being delivered to and from locations outside of Louisiana. (*SUMF* ¶ 64;  *PRSUMF* ¶ 64.)  Additionally, UPS package car drivers represent the last leg for packages journeying from other states to their final delivery places. (*SUMF* ¶ 64; *PRSUMF* ¶ 64.) UPS package car drivers perform deliveries without regard to the origin of the packages, and drive in interstate commerce. (*SUMF* ¶ 64; *PRSUMF* ¶ 64.) Plaintiff generally works with vehicles exceeding 10,001 pounds. (*SUMF* ¶ 64; *PRSUMF* ¶ 64.)

Plaintiff seizes on the "generally" in the undisputed last statement. (*PRSUMF* ¶ 64.) Plaintiff urges that the fact that Plaintiff works on such vehicles "generally" means that there are times when he in fact works on other vehicles not exceeding 10,001 pounds. (*PRSUMF* ¶ 64.)

Defendants highlight other facts related to the FLSA claim that are undisputed. For example, Plaintiff maintained his chauffeur's license, drove package cars for training demonstrations, performed training rides in the package car for weeks, ran delivery routes from time to time (such as in peak season, when packages were missed, or when there was a shortage of drivers), and shuttled packages to drivers. (*SUMF* ¶ 65; *PRSUMF* ¶ 65.) Further, Plaintiff has been called upon, either regularly or occasionally, to perform activities affecting safety. (*SUMF* ¶ 66; *PRSUMF* ¶ 66.)

### 2. Evidence Related to the Administrator or Executive Employee Exemption

Other FLSA facts are also undisputed. For instance, Plaintiff earns well in excess of $455 per week and is paid a pre-determined amount on a salaried basis. (*SUMF* ¶ 67; *PRSUMF* ¶ 67.) Further, Plaintiff performs non-manual work, including reviewing telematics, performing observations of his drivers in the office or by following them in a vehicle, and riding with drivers to train them on safety and performance methods, including conducting certifications. (*SUMF* ¶ 68; *PRSUMF* ¶ 68.) These training, safety, and performance improvement functions are directly related to the management and general business operations of UPS. (*SUMF* ¶ 68; *PRSUMF* ¶ 68.)

However, Plaintiff disputes Defendants' assertion that "Plaintiff regularly employs independent discretion and judgment." (*PRSUMF* ¶ 69.) To support this assertion, Defendants point to the fact that Plaintiff found the On Road Supervisor job rewarding because "[e]very day is different and you have a lot of challenges presented to you and a lot of problem-solving." (Pl. Dep. 54, Doc. 24-1 at 18.) Plaintiff said further, "my favorite . . . part of the job is . . . training new drivers how to do things better and seeing them actually apply the methods or the teaching or the training, and the positive experiences that can come from that, and training new drivers and watching their successes." (Pl. Dep. 54, Doc. 24-1 at 18.) Defendants also refer to the three ways

in which On Road Supervisors determine who is the "most help needed" employee and thus who they are going to perform an OJS with. (Pl. Dep. 76, Doc. 24-1 at 36.) Elsewhere, Plaintiff states that he first liked Hill because he was "a different kind of manager than [whom he had] worked with" because "[h]e didn't discuss with the supervisors very much at all" and "expected [them] to be very independent." (Pl. Dep. 97, Doc. 24-1 at 48.) Plaintiff also discussed forms he created for his employees, one of which "get[s] drivers ready for the type of expectation that they're going to have on a safety or performance OJS." (Pl. Dep. 147, Doc. 24-2 at 8.) Another form he created was "to start retraining people and letting people know what their expectations were"; Plaintiff "presented that to the workforce about what the expectations were from the A.M. to the P.M." (Pl. Dep. 194, Doc. 24-2 at 37.) Moreover, part of Plaintiff's job included making assignments that are consistent with seniority. (Pl. Dep. 165–66, Doc. 24-2 at 14–15.)

Plaintiff, on the other hand, points to the fact that he trains employees "with prescribed methods," meaning:

> [UPS] [has] a section in [it]s industrial engineering department that's called the 340 Methods[.] . . . And there are prescribed methods for doing basically every aspect of a driver's job. There's probably many methods for various jobs in the company, you know, the manual related hourly jobs. But there's a specific group of methods that the drivers are prescribed. And it's . . . my duty to ensure the drivers were following the prescribed methods. And so sometimes I may have to explain to them why they're beneficial. Sometimes it just comes down to "This is how you're supposed to do it and your way is not how it's supposed to be done." A lot of times I would have a good explanation as to why the methods are better. And so in that respect, I would coach them on the prescribed methods.

(Pl. Dep. 81–82, Doc. 24-1 at 39–40.) Thus, Plaintiff argues that his "training of new drivers is not the employment of independent discretion and judgment." (*PRSUMF* ¶ 69.)

Plaintiff also refers to the declaration of Williams, who supervised Plaintiff from February 2015 until November 2015. (Pl. Ex., Doc. 38-3.) Williams testified:

> In [Plaintiff's] role as an On [R]oad [S]upervisor he had no ability to control stops per car, which controls the amount of drivers allowed to work. [Plaintiff] was given the number of drivers who could work daily. The requirements for SPC (Stops Per Car) are handed out to all centers by the industrial engineering department, and if an On Road Supervisor failed to comply with meeting the standards he could be disciplined for failing to follow instructions. The role [Plaintiff] held was the [O]n [R]oad [S]upervisor job, and in this capacity he was given no decision making authority.

(Pl. Ex., Doc. 38-3.)

Plaintiff also disputes the following assertion made by Defendants: "Plaintiff's primary duties include the management of a department or subdivision, he directs the work of several employees, and his suggestions as to hiring, firing, advancement, promotion and discipline are given significant weight." (*SUMF* ¶ 70; *see PRSUMF* ¶ 70.) Defendants refer to the fact that Plaintiff received supervisory courses with UPS throughout the years in different courses, the topics of which addressed "[e]verything we do." (Pl. Dep. 43, Doc. 24-1 at 9.) Plaintiff also received training about discipline "through managers and labor managers and the . . . bargaining unit contract." (Pl. Dep. 44, Doc. 24-1 at 10.) Plaintiff also administers discipline and is involved in the disciplinary process, including discussions with employees, warning letters, intents to suspend, and intents to terminate. (Pl. Dep. 45–46, 48–49, Doc. 24-1 at 11–12, 14–15.) His discussions about the appropriate discipline would generally be with management. (Pl. Dep. 47, Doc. 24-1 at 13.)

Most critically, Plaintiff said that he was "involved as the person giving the information toward whatever disciplinary action is occurring . . . up to the point that the labor manager gets involved," which is after the intent to terminate is issued and after the "local hearing where the issue is discussed with a union representative." (Pl. Dep. 48–49, Doc. 24-1 at 14–15.) Plaintiff stated further:

If I have employees, it's generally – in the Baker center, [ ] Hill wanted supervisors to be solely involved in the disciplinary process. So I was pretty much involved, myself, with the union steward as a representative for the employee. . . . There were very few labor issues covered with [Hill] - - I mean, you know with - - presented with [Hill] present. And I had discussions with him beforehand often, as often as I could or as often as he should be involved.

(Pl. Dep. 49, Doc. 24-1 at 15.) While managers were involved in "all the discipline . . . in some other centers . . . [like] Atlanta, . . . [i]n Baker, [ ] Hill did announce to the supervisors that he wanted us to control the disciplinary process with our employees." (Pl. Dep. 50, Doc. 24-1 at 16.) Plaintiff still reports to Hill. (Pl. Dep. 50, Doc. 24-1 at 16.)

Additionally, Plaintiff supervised drivers as an On Road Supervisor, and, for a short time in the Baker office, supervised the "people in the office." (Pl. Dep. 56, Doc. 24-1 at 20.) He also currently supervises the customer counter consisting of three people. (Pl. Dep. 56, Doc. 24-1 at 20.) Plaintiff currently supervises "roughly 15." (Pl. Dep. 56, Doc. 24-1 at 20.)

Defendants also point to Hill's declaration. Hill stated that Plaintiff reported to him "for a time in the Baker center and reports to [him] currently in the Port Allen center." (Def. Ex. B ¶ 3, Doc. 24-6 at 1.) Hill also said Plaintiff "administered a lot of discipline to employees in the Baker center, which seemed to cause him to be disliked by some of his subordinates." (Def. Ex. B ¶ 3, Doc. 24-6 at 1.) Hill declared: "However, I usually supported the discipline he administered, and I gave significant weight to his discipline decisions and other decisions affecting employees." (Def. Ex. B ¶ 3, Doc. 24-6 at 1.)

Plaintiff disputes Defendants' statement of fact, arguing that it "fails to supply any declaration that [Plaintiff's] suggestions as to hiring, firing, advancement, or promotion are given significant weight, or provide any examples of this." (*PRSUMF* ¶ 71.) Plaintiff specifically contests Hill's declaration, saying that "suggestions regarding **discipline** are irrelevant here, and Hill's declaration does not state that he gave particular weight to [Plaintiff's] suggestions regarding

any change of status of employees." (*PRSUMF* ¶ 70 (emphasis in original).)   Plaintiff argues that he does not meet the Executive exemption.  Plaintiff does not, however, address any of his own statements which Defendants cited.

It is undisputed that UPS's treatment of employees holding the On Road Supervisor position as exempt is supported by other courts. (*SUMF* ¶ 73; *PRSUMF* ¶ 73.)  UPS seizes on this to say that it acted in good faith and had reasonable grounds for believing its actions complied with the FLSA. (*SUMF* ¶ 73.)   Defendants also refer to the On Road Supervisor Job Description attached to Plaintiff's deposition, which provides the following job summary:

> Supervises the daily results of service providers to ensure quality service, improve performance, reinforce safety principles, eliminate claims, develop volume, improve customer relations, and reduce concerns. Enhances the performance of service providers by providing effective training.  Responsible for all service provider activities and results.  Conducts on job supervision (OJS) rides to audit and reinforce service provider skills. Interacts daily with service providers, center management, and customers.   May direct the work of union and non-union employees.  Reports to the business manager and is guided by the package dispatch supervisor.

(Pl. Dep. Ex. 10, Doc. 24-4 at 8.)  Plaintiff, on the other hand, notes that other courts have not treated a supervisor as exempt and that the relevant FLSA "exemption depends not only upon the class to which the employer belongs but also the activities of the individual employee." (*PRSUMF* ¶ 73 (quoting 29 C.F.R. § 782.2(c)(2)).)

### 3. Evidence of Witt's Liability under the FLSA

Certain facts about Witt are undisputed.  Plaintiff has no knowledge of whether Witt was involved in the classification decisions. (*SUMF* ¶ 72; *PRSUMF* ¶ 72.)  Further, Witt does not possess financial control within UPS, nor does he play a role in setting pay policies. (*SUMF* ¶ 74; *PRSUMF* ¶ 74.)

In his declaration, Witt said that, as Division Manager, he "directly supervise[s] the Business Managers of the facilities in [his] division[,]" and the "Business Managers at the facilties, in turn, directly supervise the On Road Supervisors." (Def. Ex. D ¶ 3, Doc. 24-8.)  Thus, Witt "previously supervised Kim Graham and Jeffrey Hill, two Business Managers in the Baton Rouge area who supervised [Plaintiff] at different times." (Def. Ex. D ¶ 3, Doc. 24-8.)

Witt also disciplined Plaintiff "in 2017 for several issues, which are outlined in his Disciplinary Acknowledgments dated June 25, 2017 and July 5, 2017." (Def. Ex. D ¶ 6, Doc. 24-8.)  These acknowledgments encompass the incident where Plaintiff refused to return the document and was issued another discipline for insubordination, all as outlined above. (Def. Ex. D ¶ 6, Doc. 24-8.)  Witt said that his true reasons for disciplining Plaintiff are contained in the documents and that Plaintiff's "health condition and leave of absence played no role in [his] administration of discipline to Plaintiff.  [His] issues were with his conduct, not with his health status of leaves of absence." (Def. Ex. D ¶ 6, Doc. 24-8.)

Witt declared that he was "not involved in discussions regarding the pay practices for UPS's On Road Supervisors, generally, or including the specific treatment of On Road Supervisors as exempt for FLSA purposes." (Def. Ex. D ¶ 10, Doc. 24-8.)  Witt "believe[s] UPS's general pay policies and practices for On Road Supervisors are set by someone at a level much higher than me." (Def. Ex. D ¶ 10, Doc. 24-8.)  Witt also declares that he does not "possess financial control within UPS, other than trying to ensure the centers under [his] supervision are operating properly." (Def. Ex. D ¶ 10, Doc. 24-8.)  According to Witt, "[o]thers consult with [him] on personnel decisions regarding [his] subordinates, but most decisions relating to the On Road Supervisors are handled by the Business Managers." (Def. Ex. D ¶ 10, Doc. 24-8.)  Witt said he "did not maintain

[Plaintiff's] complete employment records nor was [he] primarily responsible for setting his schedule." (Def. Ex. D ¶ 10, Doc. 24-8.)

### F. Facts Related to Punitive Damages

It is undisputed that UPS had and has a written policy prohibiting harassment, Plaintiff and others received training on the policy, UPS had a compliance line and other reporting options for such complaints, and UPS investigates complaints and takes remedial action. (*SUMF* ¶ 76; *PRSMF* ¶ 76.)

### G. Plaintiff's Statement of Facts in Dispute

In his *PRSUMF*, Plaintiff provides the following "statement of genuine disputed facts:"

1. Whether UPS discriminated against [Plaintiff] in failing to grant him a reasonable accommodation and in failing to engage in an interactive process to fashion an appropriate reasonable accommodation.

2. Whether [Plaintiff] worked in part on vehicles less than 10,001 pounds.

3. Whether Mr. [Plaintiff]'s primary duties involved the day-to-day carrying out of the business' affairs, rather than running the business itself or determining its overall course or polices.

4. Whether [Plaintiff] made any suggestions or recommendations as to hiring, firing, advance, promotion, or any other change of status of any employee, and if he did, whether such were given particular weight.

(*PRSUMF*, Doc. 38-1 at 15.) These will be important later, particularly as to what is included and what is not.

### III. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material

facts. . . .     [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S. Ct. 1348 (1986) (internal citations omitted). The non-mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations and internal quotations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).

## IV.     Discussion

### A.  Americans with Disabilities Claims

#### 1. Parties' Arguments

Defendants first seek dismissal of Plaintiff's ADA claims.  As to the reasonable accommodation claim, Defendants argue that, when UPS and Plaintiff met to discuss the need for accommodations, they agreed that Plaintiff would not deliver packages for more than three consecutive days.  Plaintiff never tried to re-initiate the process.  Further, Plaintiff complained later about having to make deliveries five days per week, but these complaints were about his legs and back, not about his disability (his eye problem).  Plaintiff also conceded in his deposition that he had no medical evidence about an accommodation that UPS failed to provide.   As to other ADA claims of discrimination and retaliation,  Defendants maintain that Plaintiff failed to timely exhaust

his administrative remedies.  Further, the legitimate, nondiscriminatory reasons for Defendants'
actions were to complete expiring S&V rides that Plaintiff could not conduct during his lengthy
leave and to perform other OJS rides.  Plaintiff has no evidence of pretext or a discriminatory or
retaliatory motive.

Plaintiff responds by arguing that his new job assignment (riding in a car five days a week)
was not something he agreed to, was not a reasonable accommodation, was not a job that was
regularly given to supervisors, and was "a result of unlawful discrimination against him based on
his disability, in failing to afford a reasonable accommodation." (Doc. 38 at 2.)  Plaintiff argues
that he complained that his new position was more detrimental to his eye condition than his former
position and that he made a specific request for a better accommodation.  Plaintiff also relies on a
Fifth Circuit decision for the proposition that UPS should have again engaged in the interactive
process to find a new accommodation, but it failed to do so.  As to Defendants' exhaustion
argument, Plaintiff contends that his EEOC charge was timely based on the facts in evidence and
not Defendants' affidavit, which was submitted on "belief."  Plaintiff also disputes Defendants'
reliance on the *McDonnell-Douglas* framework and asserts that this does not apply in reasonable
accommodation cases.  Finally, it is important to note that, in "Plaintiff's statement of genuine
disputed facts," the only ADA-related issue identified is "Whether UPS discriminated against
[Plaintiff] in failing to grant him a reasonable accommodation and in failing to engage in an
interactive process to fashion an appropriate reasonable accommodation." (*PRSUMF*, Doc. 38-1
at 15.)

In reply, Defendants first assert that Plaintiff has limited his ADA claim to UPS's alleged
failure to accommodate rather than disability discrimination.  Next, they assert that Plaintiff
requested a second accommodation on nothing more than lay opinion that riding in the car five

days a week affected his eye condition.  Plaintiff failed to demonstrate that the requested accommodation was necessary for his job, that UPS knew it was necessary, and that UPS failed to accommodate him.  Plaintiff conceded that he had no medical evidence to support his claims. Plaintiff knew about UPS's ADA process, but he intentionally chose not to follow it; instead, he now complains that UPS did not provide him his personal preference of riding no more than three days a week.  But, UPS did not know of this limitation or that a reasonable accommodation was necessary for Plaintiff to perform his job.  In a footnote, Defendants argue that Plaintiff attempts to create an issue of fact on exhaustion, but he is precluded by law from contradicting his own sworn testimony.

### 2. Reasonable Accommodation Claims

#### a.  Applicable Law

At the outset, the Court agrees with Defendants that Plaintiff has limited his ADA claims solely to UPS's alleged failure to accommodate. (*See PRSUMF*, Doc. 38-1 at 15.)  Thus, the Court will focus on this cause of action only.

"The ADA prohibits covered employers from 'discriminat[ing] against a qualified individual on the basis of disability.' " *Feist v. Louisiana, Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013) (quoting 42 U.S.C. § 12112(a)). "Discrimination includes failure to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship.' " *Id.* (quoting 42 U.S.C. § 12112(b)(5)(A)). "Thus, a plaintiff must prove the following statutory elements to prevail in a failure-to-accommodate claim: (1) the plaintiff is a 'qualified individual with a disability;' (2) the disability

and its consequential limitations were 'known' by the covered employer; and (3) the employer failed to make 'reasonable accommodations' for such known limitations." *Id.* (citations omitted).

An employee who needs an accommodation has the responsibility of informing her employer and, where the disability, resulting limitations, and necessary reasonable accommodations are not open, obvious, and apparent to the employer, the initial burden rests " ' " primarily upon the employee [. . .] to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations." ' " *Griffin v. United Parcel Service, Inc.*, 661 F.3d 216, 224 (5th Cir. 2011) (quoting *E.E.O.C. v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009 (quoting *Taylor v. Principal Fin. Grp.*, 93 F.3d 155, 165 (5th Cir. 1996))). The employee's request for accommodations "must explain that the adjustment in working conditions or duties she is seeking is for a medical condition-related reason, but the employee does not have to mention the ADA or use the phrase 'reasonable accommodation.' " *Chevron Phillips*, 570 F.3d at 621.

When a qualified individual with a disability requests a reasonable accommodation, the employer and employee should engage in " 'flexible, interactive discussions to determine the appropriate accommodation.' " *Griffin*, 661 F.3d at 224 (quoting *E.E.O.C. v. Agro Distrib.*, 555 F.3d 462, 471 (5th Cir. 2009)). EEOC regulations state that an employer should initiate the interactive process, but the interactive process requires the input of the employee as well as the employer. *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 735 (5th Cir. 1999) (citing 29 C.F.R. § 1630.2(o)(3)). Phrased another way, the interactive process is "a meaningful dialogue with the employee to find the best means of accommodating [his] disability," *Chevron Phillips*, 570 F.3d at 621 (quoting *Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 108 (1st Cir. 2005)), and it "thus

36

requires ' communication and good-faith exploration,' " *id.* (quoting *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 871 (6th Cir. 2007)).  As one federal appellate court explained:

> An employee's request for reasonable accommodation requires a great deal of communication between the employee and employer [. . .] [B]oth parties bear responsibility for determining what accommodation is necessary. [. . .] [N]either party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

*Taylor v. Phoenixville School Dist.*, 184 F.3d 296, 312 (3rd Cir. 1999) (quoting *Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281, 1285 (7th Cir. 1996)). Accordingly, " '[w]hen an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the employer violates the ADA.' " *Griffin*, 661 F.3d at 224 (quoting *Loulseged*, 178 F.3d at 736). "However, an employer cannot be found to have violated the ADA when responsibility for the breakdown of the 'informal, interactive process' is traceable to the employee and not the employer." *Id.* (quoting *Loulseged*, 178 F.3d at 736).

### b.  Analysis

Having carefully considered the law and facts in the record, the Court finds that there are genuine issues of material fact which preclude summary judgment on Plaintiff's ADA claim. Construing the evidence in a light most favorable to Plaintiff and drawing reasonable inferences in his favor (as required), the Court concludes that there are fact questions as to whether UPS knew of Plaintiff's limitation for riding in the car five days a week, whether a reasonable accommodation was necessary, and whether UPS failed to provide it.

First, a reasonable juror could conclude that Plaintiff met his initial burden of "specifically identif[ing] the disability and resulting limitations, and . . . suggest[ing] the reasonable accommodations." *Chevron Phillips*, 570 F.3d at 621 (quoting *Taylor*, 93 F.3d at 165). The best evidence of this comes from Plaintiff's letter to Witt and Edwards (Pl. Dep., Ex. 38, Doc. 38-2 at 28–30), which Plaintiff testified was "accurate" (Pl. Dep. 222, Doc. 24-3 at 2), and which states in relevant part:

> It seems that after an ADA accommodation agreement and letter I have returned to work in a capacity of a newly created position that is more detrimental to my overall health and more detrimental to my specific medical condition then (sic) the position I held for most of the past 18 years, and prior to even making any such request for an accommodation. In otherwords (sic), I am much worse off in this newly created position then I would have been in my former position without any accommodation request at all. Yet, I still need a minor accommodation to maintain my eyesight and not go blind. . . .

> I am not sure who made the decision to assign me to ride in the jump seat for 5 straight work days each week but this is excessive. It's not required of any supervisor anywhere basically for the reason that after a few days it becomes very difficult to recover from the strains it puts on the body. It is way more detrimental to my medical eye condition then (sic) my former job had I never even made any accommodation request. . . .

> I do not believe I have sustained any injury at this point but all of the details I describe above are a concern for me in this newly created position, not only for my eye health but for the rest of my body. Any damage to my eyes must be evaluated by a pressure test in a doctor[']s office as I cannot generally detect an elevation in pressure until it changes the shape of my eye which then changes the vision. On Wednesday this week . . . my pressures were tested and were above normal high on full medication, which leads to blindness. . . .

> My eye condition is that of Pigmentary Glaucoma. I have severe uncontrolled Glaucoma on maximum medication and it is uncontrolled in the sense that the medication is not controlling the level of damaging pressure that leads to blindness. The curvature of my eyes inside result in the coloration (green and blue) pigment cells rubbing of and clogging the drainage. Fluid is constantly being produced in all eyes and in my eyes the drainage is blocked. The cells are removed and become free floating by action of my pupil and by physical activity and jolting or bumping. That is why excessive physical activity is detrimental to this condition "Pigmentary

Glaucoma." Riding on a package car in excessively bumpy roads contributes to the problem.  Riding for 5 days a week, weekly, when it's not even necessary for the business is very aggr[a]vating to my condition. . . .

I propose that now the center is caught up in the expired safety training rides that I be given either my old assignment with the accommodations already offered or the new assignment / the same assignment where I ride instead of day after day, to no more then (sic) 2-3 days per week as needed for business purposes and the remaining days I conduct training observation of the drivers as UPS already has an established observation procedure and requirement in our package center operations (or work as instructed in the daily operation of the center when off the car).  I feel that limiting my exposure to the package jumpseat (sic) to just 2-3 days per week (or less) as needed for training would likely be a reasonable accommodate (sic) to my medical condition and meet the needs of the company.  It would allow my body time to naturally recover and limit the amount of Pigment release and detriment to my eye condition. At this time however I am not absolutely certain that my suggestion will meet the needs of my eye health but I would like UPS to reduce their demand that I ride in a jumpseat (sic) daily everyday and I would like a trial period to determine if my eye health can sustain a reasonable amount of time in a jump seat as my eye health cannot handle the newly created position.

(Pl. Dep., Ex. 38, Doc. 38-2 at 28–30.)  Construing this letter in a light most favorable to Plaintiff and drawing reasonable inferences in his favor, a reasonable juror could conclude that Plaintiff specifically describes his problem with riding five days a week, specifically links these problems to his disability (his glaucoma), specifically explains why an accommodation is necessary, and specifically requests an accommodation. (*See* Pl. Dep., Ex. 38, Doc. 38-2 at 28–30.)  Plaintiff thus met his initial burden. *See Chevron Phillips*, 570 F.3d at 621.[2]

---

[2] Additionally, the Court notes that, contrary to Defendants' arguments, Plaintiff did have some medical evidence supporting the fact that riding in the car five days a week was detrimental to his eye health.  Specifically, Dr. Morgan's letter stated that Plaintiff's "type of glaucoma can be made worse by physical activity." (Pl. Dep., Ex. 29, Doc. 38-2 at 27.)  Further, Dr. Morgan stated that Plaintiff "should be restricted from exertional physical activity such as heavy lifting.  This restriction should be considered life long." (Pl. Dep., Ex. 29, Doc. 38-2 at 27.) Thus, while Plaintiff did not have any additional medical documentation with his own letter (Pl. Dep. 222, Doc. 24-3 at 2), a reasonable juror could conclude from Dr. Morgan's letter, again construing the evidence in a light most favorable to Plaintiff and drawing reasonable inferences in his favor, that the tough riding on the hard car seat qualified as such "exertional physical activity" and that Defendants thus had notice of Plaintiff's limitation.

Indeed, this is consistent with Plaintiff's explanation for why he didn't submit medical documentation with his letter to his employer.  Again, Plaintiff admitted that he did not "attach any medical opinions or new medical information" but said that this was because he "was simply describing that what was happening wasn't the agreed-upon ADA accommodation." (Pl. Dep. 222, Doc. 24-3 at 2.)  Plaintiff was asked whether riding five days a week was inconsistent

Second, drawing the proper summary judgment inferences, a reasonable juror could conclude that UPS was responsible for the breakdown in the interactive process and failed to provide a reasonable accommodation.  Parts of Plaintiff's letter support this, as he specifically describes Hill's refusal to discuss his need for an accommodation: "Regarding the chain of command, I have spoken to my manager, [ ] Hill, about this matter.  I sent an email without response earlier this week.  I sent a text message Wednesday this week, without response." (Pl. Dep., Ex. 38, Doc. 38-2 at 28.)  Similarly, at the end of the note, after Plaintiff explained the need for an accommodation and requested one, he said: "As a special note: I have inquired to my manager and suggested all of this to my manager and it was explained to me that my job entails daily riding for full days every day even beyond the point where training was no longer expired." *Id.*  Equally important, Plaintiff testified about Hill's refusal to discuss the problems Plaintiff was having and his need for a change; according to Plaintiff, Hill would not "engage in a conversation" with him about these new duties and eventually responded to his text messages with: "Your new job is to ride five days a week." (Pl. Dep. 206–207, Doc. 38-2 at 16.)  Further, Hill would not tell Plaintiff the reason for this new job. (Pl. Dep. 207–08, Doc. 38-2 at 16.)  A reasonable juror could conclude from all of this that UPS did not meaningfully engage in the interactive process after Plaintiff requested an accommodation. *See Chevron Phillips*, 570 F.3d at 621–22 (plaintiff "testified that she attempted to discuss the terms of her release with [her manager] to clarify her

---

with the agreed accommodation, and he explained that, when he evaluated the ADA accommodation, he did so "based on the job as [he'd] always known it and not a newly created job." (Pl. Dep. 222, Doc. 24-3 at 2.)  Plaintiff did not say in his original paperwork that "there was any limitation to [his] riding in the vehicle and performing observations" because he "didn't know that was a potential job that [he] would be facing." (Pl. Dep. 222–23, Doc. 24-3 at 2–3.)  Plaintiff did not have a problem riding in a car a couple of days a week; he had a problem with five. (Pl. Dep. 223, Doc. 24-3 at 3.)  But Plaintiff did not note this limitation "because [his] job did not require more than [he] was evaluating." (Pl. Dep. 223, Doc. 24-3 at 3.)  This evidence, when viewed in a light most favorable to Plaintiff, confirms that the original note from Dr. Morgan restricted Plaintiff from performing the very activity UPS assigned him to do—riding five days a week.

needs, but [her manager] refused to discuss it with her, saying 'No. We just can't take this. This isn't going to work.' . . . Thus a jury reasonably could find that [her employer], instead of engaging in the interactive process that the ADA requires, simply refused to consider [plaintiff's] request for accommodation."); *cf. Griffin*, 661 F.3d at 225 (affirming granting of summary judgment when "[t]here [was] simply *no evidence* that UPS was unwilling to engage in a good-faith, interactive process with [plaintiff] regarding his request for a reasonable accommodation" and when "*[n]one of the information* [plaintiff] provided UPS indicated that his requested accommodation was necessary for the management of his diabetes." (emphasis added)).

"In short, there is some evidence that each party contributed meaningfully to the breakdown in the interactive process." *Jones v. Blue Cross Blue Shield of Louisiana*, No. 16-340, 2018 WL 618599, at *9 (M.D. La. Jan. 29, 2018) (deGravelles, J.) (citing *Taylor*, 184 F.3d at 312)). "In such circumstances, the Court concludes that summary judgment is inappropriate." *Id.*

### 3. Exhaustion

#### a.  Applicable Law

"The ADA incorporates by reference the two-step administrative and judicial enforcement scheme of Title VII[.]" *Henson v. Bell Helicopter Textron, Inc.*, 128 F. App'x 387, 390 (5th Cir. 2005) (per curiam) (citing 42 U.S.C. § 12117(a)). "Thus, before a plaintiff may file a civil action under Title VII or the ADA, he must exhaust administrative remedies, which include filing a charge of discrimination with the EEOC within 300 days after the alleged violations occurred and filing suit within 90 days after receiving a right-to-sue letter from the EEOC." *Henson*, 128 F. App'x at 390–91 (citing 42 U.S.C. § 2000e–5(b), (e), (f); 42 U.S.C. § 12117).

### b.  Analysis

The Court agrees with Plaintiff that there are questions of fact on whether he exhausted his administrative remedies.  Again, Plaintiff testified that he rode five days per week for two and a half to three months after his return to work on July 11, 2016. (Pl. Dep. 230–31, Doc. 24-3 at 5.) This would put him engaging in such activity sometime between September 26 and October 11, 2016. (*See* Pl. Dep. 230–31, Doc. 24-3 at 5.)  Three hundred days after the earlier date (September 26) would be Sunday, July 23, 2017, and three hundred days after the later date (October 11) would be August 7, 2017.  Plaintiff filed his EEOC charge claiming discrimination under the ADA on July 25, 2017.  (Pl. Dep., Ex. 74, Doc. 24-5 at 24.)  Construing the evidence in a light most favorable to Plaintiff, he has created a question of fact on the issue of whether his EEOC charge was filed "within 300 days after the alleged violations" and thus whether his administrative remedies were timely exhausted.

Defendants' efforts to preclude a fact question based on other testimony Plaintiff gave in his deposition are unpersuasive.  In their reply (Doc. 40 at 3 n.5), Defendants rely on *Holtzclaw v. DSC Communications Corp.*, 255 F.3d 254, 259 (5th Cir. 2001), for the proposition that "a plaintiff cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement." *Id.* (citations and quotations omitted).  But *Holtzclaw* involved a plaintiff who, on the one hand, made numerous statements to the Social Security Administration and his employer's long term disability insurer that he was disabled and could not work, and, on the other hand, made statements to a doctor (without a medical exam) that he could perform the essential functions of his job. *Id.* at 258–59.  *Holtzclaw* correctly determined that such contradictions could not prevent summary judgment. *Id.* at 259.[3] But the instant case is

---

[3] As the *Holtzclaw* court stated:

markedly different, as it involves Plaintiff merely making slightly inconsistent statements within a single deposition when he was not sure of the "exact date." (*See* Pl. Dep. 230–31, Doc. 24-3 at 5–6.) Thus, *Holtzclaw* does not warrant the granting of summary judgment in favor of Defendants, and their motion will be denied.

### B.  Title VII Retaliation Claim

#### 1. Parties' Arguments

As to Plaintiff's Title VII retaliation claim, Defendants argue (1) that Plaintiff did not mention this claim in his EEOC charge, so he has failed to exhaust administrative remedies, and (2) that Plaintiff cannot meet the required elements because (a) he did not engage in protective activity, (b) he suffered no adverse employment action, and (c) he cannot show but-for causation. Moreover, UPS had a number of good-faith reasons for its action, including the numerous complaints about Plaintiff's supervision, his seeking unpaid personal favors from subordinates, and his insubordination.

Plaintiff fails to respond in his opposition to Defendants' Title VII arguments.  However, Plaintiff does dispute certain facts in his *PRSUMF*; for example, Plaintiff highlights that, while he did not mention his Title VII claim in his EEOC charge, he did mention the claim in his original letter to the EEOC.  However, Plaintiff does not list any facts related to his Title VII claims in his "statement of genuine disputed facts." (*PRSUMF*, Doc. 38-1 at 15.)

---

[A] plaintiff cannot change his story during litigation without a sufficient explanation for his inconsistent assertions. [Plaintiff] has offered no sufficient explanation for the contradiction between his disability applications and his claim that, when he re-applied for the job, he could have worked even without reasonable accommodation. He therefore has failed to create a material issue of fact whether he is qualified for the position he sought.

*Holtzclaw*, 255 F.3d at 259.

In reply, Defendants argue that Plaintiff has conceded that his Title VII claims should be dismissed, and they do not argue the point further.

### 2. Applicable Law

#### a. Waiver

" 'The Fifth Circuit makes it clear that when a party does not address an issue in his brief to the district court, that failure constitutes a waiver on appeal.' " *JMCB, LLC v. Bd. of Commerce & Indus.*, 336 F. Supp. 3d 620, 634 (M.D. La. 2018) (deGravelles, J.) (quoting *Magee v. Life Ins. Co. of N. Am.*, 261 F. Supp. 2d 738, 748 n. 10 (S.D. Tex. 2003) (citations omitted)); *see also United States v. Reagan*, 596 F.3d 251, 254–55 (5th Cir. 2010) (defendant's failure to offer any "arguments or explanation . . . is a failure to brief and constitutes waiver"). " 'By analogy, failure to brief an argument in the district court waives that argument in that court.' " *JMCB*, 336 F. Supp. 3d at 634 (quoting *Magee*, 261 F. Supp. 2d at 748 n. 10); *see also Kellam v. Servs.*, No. 12-352, 2013 WL 12093753, at *3 (N.D. Tex. May 31, 2013), *aff'd sub nom. Kellam v. Metrocare Servs.*, 560 F. App'x 360 (5th Cir. 2014) ("Generally, the failure to respond to arguments constitutes abandonment or waiver of the issue." (citations omitted)); *Mayo v. Halliburton Co.*, No. 10-1951, 2010 WL 4366908, at *5 (S.D. Tex. Oct. 26, 2010) (granting motion to dismiss breach of contract claim because plaintiff failed to respond to defendants' motion to dismiss on this issue and thus waived the argument).

#### b. Retaliation

"A plaintiff establishes a *prima facie* case of retaliation by showing (i) he engaged in a protected activity, (ii) an adverse employment action occurred, and (iii) there was a causal link between the protected activity and the adverse employment action." *Hernandez v. Yellow Transp.,*

44

*Inc.*, 670 F.3d 644, 657 (5th Cir. 2012) (citing *Taylor v. United Parcel Serv., Inc.,* 554 F.3d 510, 523 (5th Cir. 2008)). Concerning the last element, the Fifth Circuit has recognized:

> "Close timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a *prima facie* case of retaliation." *Swanson v. Gen. Servs. Admin.,* 110 F.3d 1180, 1188 (5th Cir. 1997). "However, we have made clear that 'the mere fact that some adverse action is taken *after* an employee engages in some protected activity will not *always* be enough for a *prima facie* case.' " *Roberson v. Alltel Info. Servs.,* 373 F.3d 647, 655 (5th Cir. 2004) (quoting *Swanson,* 110 F.3d at 1188 n. 3). Indeed, "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.' " *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S. Ct. 1508, 149 L.Ed.2d 509 (2001). This court has observed that "a time lapse of *up to* four months has been found sufficient to satisfy the causal connection for summary judgment purposes," *Evans v. City of Houston,* 246 F.3d 344, 354 (5th Cir. 2001) (emphasis added) (internal quotation marks omitted), whereas a time lapse of five months does not, without additional evidence of retaliation, establish causation. *See Raggs v. Miss. Power & Light Co.,* 278 F.3d 463, 472 (5th Cir. 2002).

*Robinson v. Our Lady of the Lake Reg'l Med. Ctr., Inc.*, 535 F. App'x 348, 353 (5th Cir. 2013) (per curiam) (finding that plaintiff failed to meet prima facie burden of establishing causation when there were five and six month gaps and no additional evidence of causation)).

"If the plaintiff successfully presents a *prima facie* case, the burden shifts to the employer to provide a 'legitimate, non-retaliatory reason for the adverse employment action.' " *Hernandez,* 670 F.3d at 657 (quoting *Long v. Eastfield Coll.,* 88 F.3d 300, 304–05 (5th Cir. 1996) (citation omitted))  "If the defendant presents evidence that supports that it acted properly, the fact-finder must decide whether retaliation was the but-for cause for the employer's action." *Id.* (citing *Long,* 88 F.3d at 305 n. 4).  That is, Plaintiff must show that, " 'but for' his participation in protected activities, he would not have" suffered the adverse employment action. *Id.* at 658.  As the Fifth Circuit has stated:

> To defeat a motion for summary judgment, a plaintiff must demonstrate "a conflict in substantial evidence on [the] ultimate issue" of "but for" causation. "Evidence is

45

'substantial' if it is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." Temporal proximity, standing alone, is not enough.

*Id.* (citations omitted).   Phrased another way, if UPS meets its burden, Plaintiff "can avoid summary judgment only by demonstrating a genuine issue of material fact as to whether [UPS's] seemingly legitimate reasons are not true reasons but instead are a pretext for retaliation." *Hypolite v. City of Houston, Tex.*, 493 F. App'x 597, 606 (5th Cir. 2012) (per curiam).

### 3. Analysis

Applying these standards, the Court will dismiss Plaintiff's Title VII retaliation claim for several reasons.   First, because Plaintiff failed to respond to Defendants' arguments about Title VII (and instead objected without legal argument to certain discrete facts), the Court finds that Plaintiff has effectively abandoned these claims.   *See JMCB*, 336 F. Supp. 3d at 634 ("Plaintiff did not respond to the substance of any of [defendant's] arguments. . . . On this ground alone, the Court could dismiss Plaintiff's Amended Complaint." (numerous internal citations omitted)); *see also Apollo Energy, LLC v. Certain Underwriters at Lloyd's, London*, 387 F. Supp. 3d 663, 672 (M.D. La. 2019) (deGravelles, J.) (finding that, because plaintiff failed to respond to defendant's argument on an issue, the Court could conclude that a policy exclusion applied (citing, *inter alia*, *JMCB*, 336 F. Supp. 3d at 634)).   Indeed, Plaintiff's failure to list his Title VII claim as a disputed issue of fact tacitly recognizes his abandonment of this claim. (*See PRSUMF*, Doc. 38-1 at 15.)

Second, even putting his waiver aside, Plaintiff's retaliation claim also fails from lack of causation.   Again, it is undisputed that the gap between Plaintiff's 2015 Williams statements and his 2017 discipline (that allegedly affected his pay) was approximately two years. (*SUMF* ¶ 59; *PRSUMF* ¶ 59.)   This two-year period is well beyond the four-month period usually found to be sufficient to establish causation.   Further, Plaintiff has pointed to no other evidence linking any

alleged adverse action to the statements he made in the Williams matter. To the contrary, Plaintiff concedes (1) that no one said anything negative to Plaintiff about his statements in the Williams matter (*SUMF* ¶ 62; *PRSUMF* ¶ 62); (2) that the only information Plaintiff said UPS tried to elicit from Plaintiff for the Darin Williams statement was "the exact dates, times, and length of times" (*SUMF* ¶ 60; *PRSUMF* ¶ 60); and (3) that Plaintiff's statements about Williams's conduct were part of the basis for discipline against Williams (*SUMF* ¶ 60; *PRSUMF* ¶ 60). Thus, Plaintiff fails to meet his *prima facie* burden of establishing causation. *See Hypolite*, 493 F. App'x at 607 (finding that plaintiffs failed to meet their *prima facie* burden of showing retaliation when there was a nine-month gap between discipline and their discrimination suit and when there was no other evidence of retaliation); *Robinson*, 535 F. App'x at 353 (reaching the same result with five and six month gaps and no additional evidence of retaliation).

And third, even assuming Plaintiff had met his *prima facie* burden, UPS has come forward with numerous legitimate, non-discriminatory reasons for any discipline he received, two of which were his having other employees perform personal favors for him and his insubordination to Witt. Thus, it is Plaintiff's burden to show that these reasons were a pretext for retaliation and that the but-for cause of his discipline was his protected activity. He has failed to do so. To the contrary, it is undisputed that Plaintiff did solicit handouts from employees and have them perform favors for him (*SUMF* ¶¶ 8–10; *PRSUMF* ¶¶ 8–10), and UPS's account of Plaintiff's insubordination with Witt is largely undisputed (*See SUMF* ¶¶ 11–14; *PRSUMF* ¶¶ 11–14). And, as laid out above, there are numerous other problems with causation that are unrebutted (and, indeed, undisputed). (*See SUMF* ¶¶ 60–62; *PRSUMF* ¶¶ 60–62.) Thus, even assuming Plaintiff had met his *prima facie* burden (which is doubtful), Plaintiff has failed to produce substantial evidence demonstrating that retaliation was a but-for cause of any adverse action he suffered. *See Hypolite*, 493 F. App'x at

47

606 (finding that plaintiff's violation of "several department and City policies" was legitimate, non-retaliatory reason for suspension and that plaintiff offered no evidence of pretext).  For all these reasons, Defendants' motion is granted, and Plaintiff's Tile VII retaliation claim against UPS is dismissed.

### C.  FLSA Claims

#### 1. FLSA Exemptions

##### a.  Parties' Arguments

Defendants next argue that, while the FLSA generally entitles employees to overtime, the statute contains certain exemptions.  Defendants assert that three such exemptions apply to Plaintiff: (1) the Motor Carrier exemption; (2) the Administrative exemption; and (3) the Executive exemption.  As to the first, UPS is exempt because it is engaged in the transport of goods across state lines or the interstate transport of goods in the flow of interstate commerce. (Doc. 24-10 at 14 (citation omitted).)  Plaintiff also meets the second prong of this exemption because he is "engaged in activities of a character directly affecting the safe operation of motor vehicles in interstate commerce," which includes driving. (Doc. 24-10 at 15 (citation omitted).)  Additionally, according to Defendants, Plaintiff also meets the Administrative exemption because he performs non-manual duties that directly relate to management policies and general business operations of UPS, including some that require the exercise of discretion and judgment.  Lastly, Plaintiff meets the Executive exemption "because his primary duties include the management of a department or subdivision, he directs the work of several employees, and his suggestions as to hiring, firing, advancement, promotion, and discipline are given significant weight." (Doc. 24-10 at 17.)

Plaintiff responds that he was not exempt from overtime payment.  Defendants have the burden of proving the Motor Carrier exemption applies, and it must be given a "fair reading."

Plaintiff argues that the Small Vehicle exception to the Motor Carrier exemption applies, which says that a covered employee is one whose work, "in whole or in part, is defined . . . as affecting the safety of operation of motor vehicles weighing 10,000 pounds or less in transportation on public highways. . . ." (Doc. 38 at 9 (citation omitted).)  Here, Witt said in his declaration that the vehicles "generally" exceed 10,001 pounds, so Defendants essentially concede that Plaintiff's work, at least in "part," deals with vehicles weighing under 10,000.  Thus, the Small Vehicle exception applies.  Additionally, Plaintiff maintains that his duties were not such that he fell under the Administrative exemption, as he followed "prescribed procedures" rather than "exercising discretion and independent judgment." (Doc. 38 at 10 (citations omitted).)  Lastly, the Executive exemption does not apply; while Defendants may have given Plaintiff's decisions regarding *discipline* particular weight, Defendants fail to demonstrate that UPS gave particular weight to decisions regarding the change of status of employees, as required by this exemption.

In reply, Defendants state that Plaintiff conceded that the Motor Vehicle exemption applies, so the only question is whether Plaintiff met his burden of proving the Small Vehicle exception.  Here, Plaintiff "offered **no** evidence that the package cars on which Plaintiff worked had a gross vehicle weight rating ("GVWR") of less than 10,000 pounds in any work week."  (Doc. 40 at 4.)  Thus, Plaintiff's FLSA claim fails.  Additionally, Plaintiff fails to dispute his own testimony that the Administrative and Executive exemptions apply. (Doc. 40 at 5.)

### b.  Applicable Law

Although Plaintiff makes compelling arguments about the Motor Vehicle and Administrative exemptions (or, at the very least, why there are questions of fact on these issues), the Court finds the Executive exemption dispositive of these claims.  Thus, the Court will focus solely on that.

49

"The FLSA requires employers to pay overtime compensation for nonexempt employees." *Rainey v. McWane Inc.*, 314 F. App'x 693, 694 (5th Cir. 2009) (per curiam) (citing 29 U.S.C. § 207(a)). "However, this requirement does not extend to employees who are 'employed in a bona fide executive, administrative, or professional capacity.' " *Id.* at 694–95 (quoting 29 U.S.C. § 213(a)(1)). The Executive and Administrative "exemptions are construed narrowly against the employer and the employer has the burden of proving that an employee is exempt." *Tyler v. Union Oil Co. of California*, 304 F.3d 379, 402 (5th Cir. 2002) (citing *Dalheim v. KDFW–TV*, 918 F.2d 1220, 1224 (5th Cir. 1990)).

"Under the controlling Department of Labor regulation, th[e] 'executive capacity' exemption applies to any employee who[,] . . . [*inter alia*,] has 'the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.' " *Rainey*, 314 F. App'x at 695 (quoting 29 C.F.R. § 541.100(a)). As to this prong, " '[a]n employee's suggestion may be deemed to have 'particular weight' even if 'a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status.' " *Id.* at 696 (quoting 29 C.F.R. § 541.105).

### c.  Analysis

The Court finds that, as a matter of law, the Executive exemption applies. Plaintiff focuses his argument on one component of the Executive exemption test, arguing that Defendants fail "to supply any declaration that [Plaintiff's] suggestions as to hiring, firing, advancement, or promotion are given significant weight, or provide any examples of this." (*PRSUMF* ¶ 70.)  However, the Court finds that Plaintiff fails to create a question of fact on this issue.

Plaintiff specifically attacks Hill's declaration, which said that Plaintiff "administered a lot of discipline to employees in the Baker center, which seemed to cause him to be disliked by some of his subordinates" and that Hill "usually supported the discipline he administered, and . . . gave significant weight to his discipline decisions and other decisions affecting employees." (Def. Ex. B ¶ 3, Doc. 24-6 at 1.)  Plaintiff maintains that "suggestions regarding **discipline** are irrelevant here, and Hill's declaration does not state that he gave particular weight to [Plaintiff's] suggestions regarding any change of status of employees." (*PRSUMF* ¶ 70 (emphasis in original); *see also* Doc. 38 at 10.)  If Hill's testimony were all Defendants had, Plaintiff may have prevailed on this issue.

But Defendants also point to Plaintiff's own testimony, which is fatal to his claim.  Again, Plaintiff testified that he administers discipline and is involved in the disciplinary process, including discussions with employees, warning letters, intents to suspend, and intents to terminate. (Pl. Dep. 45–46, 48–49, Doc. 24-1 at 11–12, 14–15.)  His discussions about the appropriate discipline would generally be with management. (Pl. Dep. 47, Doc. 24-1 at 13.)  Critically, Plaintiff testified that he was "involved as the person giving the information toward whatever disciplinary action is occurring . . . up to the point that the labor manager gets involved," which is after the intent to terminate is issued and after the "local hearing where the issue is discussed with a union representative." (Pl. Dep. 48–49, Doc. 24-1 at 14–15.)  Plaintiff said further:

> If I have employees, it's generally – in the Baker center, [ ] Hill wanted supervisors to be *solely involved* in the disciplinary process.  So I was pretty much involved, myself, with the union steward as a representative for the employee.  . . . *There were very few labor issues covered with [Hill] – I mean, you know with - - presented with [Hill] present*.  And I had discussions with him beforehand often, as often as I could or as often as he should be involved.

(Pl. Dep. 49, Doc. 24-1 at 15 (emphasis added).)  While managers were involved in "all the discipline . . . in some other centers . . . [like] Atlanta, . . . [i]n Baker, [ ] *Hill did announce to the*

*supervisors that he wanted us to control the disciplinary process with our employees.*" (Pl. Dep. 50, Doc. 24-1 at 16.)  And Plaintiff still reports to Jeff Hill. (Pl. Dep. 50, Doc. 24-1 at 16.) Thus, Plaintiff's own admissions establish that his "suggestions and recommendations as to . . . firing . . . or any other change of status of other employees are given particular weight.' " *Rainey*, 314 F. App'x at 695 (quoting 29 C.F.R. § 541.100(a)).

Indeed, this case is remarkably similar to *Rainey*.  There, the Fifth Circuit affirmed the granting of summary judgment on the "[E]xecutive capacity" exemption when the employer "presented evidence that the production supervisors exclusively evaluate provisional workers and provide recommendations as to their hiring as regular employees" and when the plaintiffs had "not provided any evidence to contradict this practice or indicate that the these recommendations are not typically followed." *Rainey*, 314 F. App'x at 696.  Similarly, Defendants here present evidence that discipline (up to and including intents to terminate) was "solely" within Plaintiff's "control," and Plaintiff has failed to present any evidence to contradict Plaintiff's own testimony or Hill's declaration that Hill typically followed Plaintiff's recommendations. (*See* Doc. 40 at 4.)

In sum, all reasonable jurors would find from Defendants' evidence that UPS management gave particular weight to Plaintiff's recommendations on discipline, including terminating employees.  Consequently, as a matter of law, Plaintiff is exempt under the FLSA as an Executive employee, and UPS is entitled to summary judgment on this claim.

### 2. Witt's Liability

Additionally, Defendants argue that Witt is not liable under FLSA because there is no individual personal liability.  Plaintiff does not oppose this argument.  Accordingly, because Plaintiff has waived any claim under the FLSA against Witt, *see JMCB, supra*, Plaintiff's FLSA claim against him is dismissed.

### D.  State Law Claims

Defendants also seek dismissal of Plaintiff's other state law claims, including the one made under Louisiana Civil Code article 2315.  According to Defendants, Plaintiff's claim is foreclosed by this Court's ruling in *Story v. Our Lady of the Lake Physician Grp.*, No. 17-651, 2018 WL 1902687 (M.D. La. Apr. 20, 2018) (deGravelles, J.), which found that Article 2315 is inapplicable to state law causes of action where there is a specific remedial scheme, like employment discrimination.  Plaintiff does not respond to any of Defendants' arguments on this issue.

The Court will grant Defendants' motion as to Article 2315.  Plaintiff has waived his claim by failing to respond, *see JMCB*, *supra*, and, in any event, the Court agrees with Defendants' assessment of *Story*.  Accordingly, Plaintiff's state law claims under Article 2315 are hereby dismissed.

However, the Court will grant in part and deny in part Defendants' motion with respect to the LEDL claims.  "Title VII, the ADA, and the LEDL, provide similar rights and remedies; thus, both federal and state courts use the standards set forth under the ADA and Title VII to analyze LEDL claims." *Thibodeaux v. Dow Chem. Co.*, No. 16-567, 2018 WL 2269906, at *10 (M.D. La. May 17, 2018) (Jackson, C.J.) (numerous citations omitted).  Thus, because Plaintiff has demonstrated a question of fact with respect to whether he was provided a reasonable accommodation, his claim under La.  Rev. Stat. Ann. § 23:323 survives.  Conversely, because the Court granted Defendants' motion as to Title VII, the corresponding state law claim is dismissed.

### E.  Punitive Damages

#### 1. Parties' Arguments

Defendants next seek dismissal of Plaintiff's claim for punitive damages.  UPS contends that "it engaged in 'good-faith' efforts to comply with federal anti-discrimination laws." (Doc. 24-

10 at 20 (citation omitted).)    Defendants urge that "UPS had a written policy prohibiting harassment, Plaintiff and others received training on the policy, UPS had a compliance line and other reporting options for such complaints, and it investigated employee complaints and took remedial action." (Doc. 24-10 at 20.) Defendants urge that this "well exceeded what is necessary for the good-faith defense," so Plaintiff is not entitled to punitive damages. (Doc. 24-10 at 20 (citation omitted).)    Plaintiff does not specifically address punitive damages in his opposition, and Defendants do not mention them in their reply.

## 2. Applicable Law

"A plaintiff may recover punitive damages if the defendant acted 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.' " *E.E.O.C. v. E.I. Du Pont de Nemours & Co.*, 480 F.3d 724, 732 (5th Cir. 2007) (quoting 42 U.S.C. § 1981a(b)(1)). "The availability of punitive damages turns on the defendant's state of mind, not the nature of the defendant's egregious conduct." *Id.* (citing *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535, 119 S. Ct. 2118, 2124, 144 L. Ed. 2d 494 (1999)).    "The employer 'must at least discriminate in the face of a perceived risk that its actions will violate' the ADA." *Id.* (quoting *Kolstad*, 527 U.S. at 536, 119 S. Ct. at 2125). "Moreover, the plaintiff must show that the 'malfeasing agent served in a "managerial capacity" and committed the wrong while "acting in the scope of employment." ' " *Id.* (quoting *Rubinstein v. Adm'rs of the Tulane Educ. Fund*, 218 F.3d 392, 405 (5th Cir. 2000) (citing *Kolstad*, 527 U.S. at 541, 119 S. Ct. at 2127)). "However, under the good-faith exception, 'an employer may not be vicariously liable for the discriminatory employment decision of managerial agents where these decisions are contrary to the employer's good-faith efforts to comply with Title VII[,]' " or, here, the ADA. *See id.* (quoting *Rubinstein*,

218 F.3d at 405 (citing *Kolstad*, 527 U.S. at 545, 119 S. Ct. at 2129) (internal quotation marks omitted)).

Thus, in *E.I. Du Pont*, the Fifth Circuit found sufficient evidence to support a jury award of punitive damages when the employer "was aware of its responsibilities under the ADA[,] [y]et, viewed in the light most favorable to the verdict, . . . made [the employee's] job more difficult":

> The company placed Barrios's printer over one hundred feet from her desk in spite of her walking difficulties, whereas other lab clerks' printers were adjacent to their desks. DuPont refused to allow Barrios to demonstrate her ability to evacuate before she was terminated—for inability to evacuate. The company spent years trying to convince Barrios to retire on disability. But the crowning evidentiary blow against DuPont is that after Barrios attempted to get her job back, a DuPont supervisor stated that he no longer wanted to see her "crippled crooked self, going down the hall hugging the walls."

*E.I. Du Pont*, 480 F.3d at 733.  The Fifth Circuit concluded that "[t]he jury . . . could have rejected DuPont's good-faith defense based on the conclusory assertions by two DuPont employees that they comply with the law." *Id.*

*E.I. Du Pont* cited as comparing authority *Hatley v. Hilton Hotels Corp*., 308 F.3d 473 (5th Cir. 2002). *E.I. Du Pont*, 480 F.3d at 733.  In *Hatley*, the Fifth Circuit found, in a Title VII sexual harassment case, that there was no need for a jury instruction on punitive damages. *Hatley*, 308 F.3d at 477. *Hatley* reached this conclusion even though a managerial employee "may have acted with malice or reckless indifference to the rights of the plaintiffs" because:

> [T]hese actions were contrary to [defendant's] good faith effort to prevent sexual harassment in the workplace, as is evidenced by the fact that [defendant] had a well-publicized policy forbidding sexual harassment, gave training on sexual harassment to new employees, established a grievance procedure for sexual harassment complaints, and initiated an investigation of the plaintiffs' complaints. These actions evidence a good faith effort on the part of [defendant] to prevent and punish sexual harassment.

*Hatley*, 308 F.3d at 477.

### 3. Analysis

Having carefully considered the law and facts in the record, the Court will grant summary judgment on this issue, for two reasons.  First, Plaintiff completely failed to respond to Defendants' arguments about punitive damages, so he has effectively waived this claim. *See JMCB*, *supra*. Second, even putting the waiver aside, this case is much closer to *Hatley* than to *E.I. Du Pont.* Again, it is undisputed that UPS had and has a written policy prohibiting harassment, Plaintiff and others received training on the policy, UPS had a compliance line and other reporting options for such complaints, and it investigates complaints and takes remedial action. (*SUMF* ¶ 76; *PRSMF* ¶ 76.)  Thus, as in *Hatley*, even if Hill and others acted with malice and indifference toward Plaintiff's rights under the ADA, this was contrary to UPS's efforts to comply with the statute. *See Hatley*, 308 F.3d at 477.  Further, this case is a far cry from *E.I. Du Pont*, where the company "spent years" trying to get rid of the plaintiff, terminated her despite not providing an opportunity for her to comply, and made a reprehensible remark about her disability. *See E.I. Du Pont*, 480 F.3d at 733.  Here, Plaintiff only rode five days a week for two to three months, and UPS did not fight Plaintiff when he refused to continue but instead allowed him to work as he desired, to this day.  In sum, no reasonable juror could conclude that UPS is not entitled to the good faith defense, so summary judgment on this issue is granted.

### V.    Conclusion

Accordingly,

**IT IS ORDERED** that the *Motion for Summary Judgment* (Doc. 24) filed by Defendants United Parcel Service, Inc., and Paul Witt is **GRANTED IN PART** and **DENIED IN PART**.  All of Plaintiff's claims against Defendants—except Plaintiff's claim against UPS under the ADA and LEDL for its alleged failure to accommodate—are hereby **DISMISSED WITH PREJUDICE.**

Signed in Baton Rouge, Louisiana, on September 19, 2019.

_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**